# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE GENELUX CORPORATION, a Delaware corporation, | : : : : | |
| GENELUX CORPORATION, a Delaware corporation, and RON SIMUS, | : : : : : : | |
| Plaintiffs, v. | : : : : | Civil Action No. 10042-VCP |
| ALBERT ROEDER and BYRON GEORGIOU, | : : : : : | |
| Defendants, | : : | |
| and | : : : | |
| DR. ALADAR SZALAY, | : : : | |
| Intervenor. | : : : | |

## OPINION

Date Submitted: June 24, 2015
Date Decided: October 22, 2015

Raymond J. DiCamillo, Esq., Susan M. Hannigan, Esq., J. Scott Pritchard, Esq., Rachel E. Horn, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jake Ryan, Esq., Colleen C. Smith, Esq., LATHAM & WATKINS LLP, San Diego, California; *Attorneys for Plaintiffs*.

John L. Reed, Esq., Scott B. Czerwonka, Esq., Harrison S. Carpenter, Esq., DLA PIPER LLP (US), Wilmington, Delaware; Robert Brownlie, Esq., Amanda C. Fitzsimmons, Esq., DLA PIPER LLP (US), San Diego, California; *Attorneys for Defendants and Intervenor*.


**PARSONS, Vice Chancellor.**

In this action under 8 *Del. C.* §§ 205 and 225, I am asked to determine the outcome of an annual election of directors based on my resolution of various disputes over whether certain shares of stock were issued validly or lacked consideration. One plaintiff, the company, issued the stock in question, and the other, a director-stockholder, invested in the company near its founding and participated in planning and executing a secret plot to remove the intervenor as CEO. The plaintiffs ask me to set aside the intervenor's election of the two defendant directors at the company's most recent annual meeting.

The plaintiff company's Section 205 claim raises a novel issue of law: whether that statute permits an enumerated party to petition this Court to declare invalid and defective any corporate act or stock. I conduct an exercise of statutory interpretation and answer that question in the negative. The plaintiff director-stockholder, on the other hand, also raises a traditional Section 225 challenge, which I resolve in favor of the defendants and the intervenor. In doing so, I find that some of the plaintiffs' arguments are waived or time-barred.

I presided over a two-day trial. This Opinion contains my post-trial findings of fact and conclusions of law as to the plaintiffs' Section 205 and 225 claims. For the reasons stated herein, I conclude that none of the grounds advanced by the plaintiffs provide a sufficient basis to grant them the requested relief. Thus, I hold that the defendant directors were elected validly and are entitled to the declaratory relief they seek.

## I.     BACKGROUND[1]

Plaintiff Genelux Corporation (the "Company") is a privately held, clinical stage biopharmaceutical company incorporated in Delaware and headquartered in San Diego, California, with additional operations in Germany.  Intervenor, Dr. Aladar Szalay, along with Dr. Douglas Will and Dr. John Thomas (together, the "Founders"), founded Genelux around 2001.  In early 2014, certain stockholders and directors, including Thomas and Plaintiff Dr. Ron Simus, engaged George Vandeman, a seasoned corporate attorney, to devise in secret a succession plan to terminate Szalay's employment with Genelux.  On May 2, 2014, at a regular meeting of the Board of Directors, then consisting of Szalay, Simus, Thomas, James Tyree, and Defendant Dr. Albert Roeder, the Board voted, with Roeder abstaining, to appoint Bill Parrott and Peter Kroll to fill two vacant positions with immediate effect.[2]  Then, members of the Board other than Szalay and Roeder voted to terminate Szalay's employment with the Company and remove him as Chairman, Chief Executive Officer, President, and Chief Scientific Officer.  Neither Szalay nor Roeder received notice before the May 2, 2014 meeting that the other members of the Board were planning to vote on Szalay's termination.  Initially, Szalay resigned from his

---

[1]     Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text.  Exhibits are cited as "JX #" and stipulated facts drawn from the parties' pre-trial Joint Stipulation are cited as "JS ¶ #."  After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended.

[2]     JX 72.

2

positions in lieu of termination, accepted the title of Chairman Emeritus, and agreed to be a science advisor to Thomas Zindrick, the new CEO. On June 12, 2014, however, Szalay rejected these positions and resigned from the Board. At a Board meeting on May 23, 2014, the Board voted to add two members, appointed Zindrick and Vandeman to fill those positions, and made Vandeman Vice-Chairman.[3]

After he and his allies gained control of the Board, Vandeman supervised and conducted an "exhaustive examination" into Szalay's tenure. This examination was carried out in part by: John Prunty, Genelux's Chief Financial Officer; Nate Schilt, the Company's corporate counsel; Melodee Newbold, Vice President for Investor Relations; and Newbold's assistant, Kim Duffy.[4] On July 1, 2014, Directors Simus, Thomas, and Tyree sent a letter to stockholders, drafted by Vandeman, reporting the results of that investigation.[5] Among other things, the letter reported that: (1) the Company disputed the validity of 1.5 million (the "Disputed Shares") of the 3 million Series A Preferred shares or "Founders' Shares" that Szalay purported to own; (2) Szalay had convinced the Company to issue the Disputed Shares to him in 2009 by claiming wrongfully they had been "stolen" or "taken" from him; and (3) the Board and stockholders had been forced to rely on Szalay's word because he prevented management and the Board from

---

[3]     JX 73.

[4]     Tr. 408-09 (Vandeman).

[5]     JX 83.

3

accessing corporate records.[6] These allegations later became the basis for the Company's complaint in this action.

The Company's Annual Meeting took place on August 15, 2014, during which, among other things, the stockholders voted to elect certain candidates to the Company's Board. The holders of the Founders' Shares, voting alone, are entitled to elect two members of the Company's Board. Szalay, purporting to hold 3 million, or two-thirds, of the outstanding Founders' Shares, voted to elect Roeder and Defendant Byron Georgiou. On the same day as the Company's Annual Meeting, Genelux filed its original petition in this Court seeking, pursuant to Section 205 of the Delaware General Corporation Law ("DGCL"), a declaration that the Disputed Shares are invalid. On August 20, 2014, Genelux filed its Amended Complaint, the operative complaint in this case, adding Simus as a plaintiff and a Section 225 claim for a declaration that the elections of Roeder and Georgiou were invalid because Szalay only held 1.5 million Founders' Shares.

To resolve Szalay's contested ownership of the Disputed Shares, this Opinion examines the history of Genelux. Genelux originated from the combined efforts of Szalay, Will, and Thomas to commercialize certain of Szalay's scientific discoveries. The parties dispute, however, several of the events and agreements surrounding the Company's formation and initial capitalization. In the Company's first year or so, Will acted unilaterally as the sole director and held Board meetings, appointed officers, entered into employment and credit agreements, and issued preferred and common stock.

---

[6]     *Id.*

But, almost immediately, a dispute arose between the Founders regarding Will's management and stock ownership, which led the Company and certain stockholders to file separate lawsuits against Will and his wife in California (the "Wills Dispute") and later settle those disputes (the "Wills Settlement") in a way that resulted in the Wills' departure from the Company. During the following several years, Szalay attempted repeatedly to recover the Disputed Shares, maintaining that, in contravention of the Founders' agreement under which Szalay and Will each were to get 3 million and Thomas was to get 1.5 million Founders' Shares, Will had given the Disputed Shares to his wife. In 2009, when Genelux was negotiating with Abbott Laboratories regarding a potential $25 million investment in Genelux (the "Abbott Deal"), actions were taken to amend the Company's certificate of incorporation and issue the Disputed Shares to Szalay.[7]

### A. The Parties and Relevant Non-Parties

Will incorporated Genelux on September 4, 2001, served initially as its sole director, Chairman, and President, and controlled 4.5 million Founders' Shares until November 2003.[8] Will is a neurologist who graduated from Loma Linda University

---

[7]    JX 62, 66.

[8]    Technically, Will's wife executed a Credit Agreement, effective August 1, 2002, that purportedly entitled her to 3 million Founders' Shares, JX 4, which were issued to a trust for the benefit of the Wills' children. JX 100. Effective September 1, 2002, Will's wife also executed a Supplemental Credit Agreement entitling her to an additional 1.5 million Founders' Shares. JX 9. For simplicity, however, I treat the Wills' Founders' Shares as if they were owned by Will himself.

Medical Center ("Loma Linda"). He later worked at Loma Linda, serving as Chairman of the Department of Neurology, Dean of the School of Medicine, and Chief of Staff of the Medical Center.

Thomas, who co-founded Genelux, served as its initial CFO, holds 1.5 million Founders' Shares, and is a director of the Company. He is the Dean of the Business School at La Sierra University, the sister campus of Loma Linda.

Szalay, the third of Genelux's co-founders, is the acknowledged holder of 1.5 million Founders' Shares and 11 million shares of common stock and the Company's former Chairman, CEO, President, and CSO. Szalay received his Ph.D. in biochemistry from Martin Luther University in Halle, East Germany, in connection with the Hungarian National Academy of Sciences, in 1971. He is currently a professor at the University of Wurzburg in Bavaria, Germany, and a faculty member in radiation oncology at the University of California, San Diego Cancer Center.

Simus, the first Series B Preferred stockholder, invested in Genelux in 2002 and became a director in 2003. At that time, Simus was a practicing orthodontist, but, in 2007, he joined the Company full-time as a vice president working in investor relations and fundraising. The same counsel representing the Company in this case, Latham & Watkins LLP ("Latham") and Richards, Layton & Finger, P.A. ("RLF"), are representing Plaintiff Simus, and the Company is paying or will pay for all of the attorneys' fees Simus incurs in connection with prosecuting his Section 225 claim.[9]

---

[9] JS ¶ 3.

Vandeman was a corporate attorney at Latham for twenty-nine years and later worked as General Counsel of Amgen for several years. He is currently vice chairman of Genelux's Board. Vandeman first became acquainted with Genelux in 2009 when he led the Company's negotiations with Abbott Laboratories for its potential $25 million investment. Vandeman left the Company while those negotiations still were ongoing. He returned to Genelux at the request of certain stockholders in 2014 to devise and implement a plan to remove Szalay from power at the Company.

Zindrick, who is an attorney, worked for Dow Chemical Company and Amgen for many years and is currently Genelux's CEO. Zindrick first became acquainted with Genelux in 2009 when he was hired as a consultant. He succeeded Vandeman in leading the negotiations with Abbott on Genelux's behalf. The Board installed Zindrick as CEO after removing Szalay on May 2, 2014.

Roeder and Georgiou are named as Defendants because Szalay purported to elect them as directors at the August 15, 2014 Annual Meeting. Whether Szalay owns lawfully the shares necessary to have elected Roeder and Georgiou is the subject of this lawsuit. Where relevant, I refer to Defendants Roeder and Georgiou and Intervenor Szalay collectively as "Defendants."

## B.    Facts

In connection with Genelux's August 15, 2014 Annual Meeting, Szalay purported to elect Roeder and Georgiou by voting 3 million Founders' Shares. Evaluating Plaintiffs' challenge to whether Szalay owns validly the 1.5 million Disputed Shares requires reviewing a number of disputed facts surrounding Genelux's formation. Szalay

7

and Will provide differing accounts of who founded Genelux and when, and the documentary record appears incomplete. Because Szalay has claimed entitlement to the Disputed Shares since Genelux's inception and the Founders formed Genelux to commercialize Szalay's life work, I first discuss his career to put Genelux's formation in context.

### 1. Genelux's origins

In the late 1970s, after studying modern genetic engineering at the California Institute of Technology for several years, Szalay joined the newly established Boyce Thompson Institute at Cornell University as an associate researcher and adjunct professor in microbiology and biochemistry. At Cornell, Szalay and his team achieved a breakthrough in genetic engineering that received global recognition. As a result, numerous companies, including Crown Zellerbach, DuPont, and Kodak, invited Szalay to be an advisor and give lectures. Szalay continued researching genetic pathways and ultimately was able to transfer light-emitting genes from ocean organisms into bacteria and viruses. Genelux later took its name from this cell-illuminating technology: "Gene-," for genetic material, and "lux," for luminescence or the sign of light.

The University of Alberta in Edmonton, Canada, awarded Szalay with an endowed chair for medicine, science, and agriculture in 1988. While at the University of Alberta, Szalay became acquainted with Will when Will interviewed Szalay for an opening at Loma Linda. Loma Linda made Szalay a tenured professor in microbiology, molecular genetics, and biochemistry in the medical school and the Director of the Center for

8

Molecular and Gene Therapy, which he developed into one of the largest research units at the university. Will left Loma Linda shortly after Szalay arrived.

Szalay described his work in the gene therapy center at Loma Linda as "start[ing] this field from scratch."[10] During the 1990s, his team discovered that tumors in mice, when injected with light-emitting viruses, split up and emitted more and more light, which they concluded would allow doctors to diagnose cancer more precisely and, Szalay predicted, to treat cancer safely without side effects to healthy tissues. This discovery was disclosed to Loma Linda, but the institution declined to finance its development and returned the invention to Szalay and his team.

Around this time, Szalay also became a distinguished professor at the University of Wurzburg. When Loma Linda declined to patent his discovery, Szalay caused a patent application to be filed on it on or about July 29, 2001.[11] Using €1.5 million from his own academic and research programs, Szalay started a research program with graduate students and postdoctoral researchers in Germany.

Szalay instigated Will's eventual incorporation of Genelux when Szalay contacted Will about Szalay's work at Loma Linda.[12] Will confirmed that he founded Genelux for

---

[10] Tr. 458.

[11] Tr. 461; *see also* JX 20 (stating July 31, 2001).

[12] Tr. 74-75 (Will).

9

the purpose of commercializing and conducting further research pertaining to intellectual property on which Szalay was working.[13]

Beyond a basic agreement to commercialize Szalay's work, the parties dispute the details and legal effect of the Founders' discussions that led to the Company's formation. Szalay testified that he talked to Will about managing the Company in Szalay's absence and handling the various formalities and business basics and that he reached out to Thomas, who was head of the business school, because Szalay had no experience in business or in leading a company.[14]  Thomas recalled that the Founders had early discussions about the potential formation of Genelux at his home near Loma Linda, before the Company's incorporation on September 4, 2001, and that they discussed allocating 11 million shares of common stock and 3 million Founders' Shares to Szalay, 3 million Founders' Shares to Will, and 1.5 million Founders' Shares to Thomas.[15] Thomas also testified that the initial board of directors was supposed to be comprised of the three Founders, that the Founders decided who the officers would be at those initial meetings, and that Will's wife was not supposed to have any role at Genelux.[16]  Szalay's

---

[13]     Tr. 16.

[14]     Tr. 464.

[15]     Tr. 94-95.

[16]     Tr. 160-61 ("Dr. Szalay wanted Dr. Doug Will to be the president and CEO.").

testimony on these matters comports with Thomas's.[17]  Will admits to having had meetings with Thomas and Szalay before incorporating Genelux, but denies having come to any agreement regarding its formation, the allocation of Founders' Shares, or the appointment of officers.[18]

The exact timing and details of the Founders' early discussions regarding Genelux's formation are unclear.  Nonetheless, I find Thomas's and Szalay's testimony on this matter more credible than Will's.  Additionally, as discussed *infra*, the parties' subsequent conduct is more consistent with Thomas's and Szalay's testimony and the evidentiary record and tends to discredit Will's description of what occurred.  Thus, I conclude that Szalay has demonstrated by a preponderance of the evidence that the Founders did reach some form of agreement in principle under which they would be the Company's initial three directors and Szalay, Will, and Thomas would receive 3 million, 3 million, and 1.5 million Founders' Shares, respectively.

### 2. Will acts unilaterally as Genelux's sole director

Will caused Genelux to be incorporated in Delaware on September 4, 2001.[19]  Genelux's initial Board of Directors, consisting solely of Will, first met on October 1, 2001.  Acting as Chairman, Will nominated and elected himself to be President, his wife

---

[17]  Tr. 467 ("It was decided immediately that we three [Founders] would become board members immediately. . . .  I think Dr. Will [was] supposed to become the president and chairman [sic: CEO]; Dr. Thomas, the CFO; and I [was] supposed to become the chairman of the board.").

[18]  Tr. 76.

[19]  JX 1.

to be Treasurer, and Katherine Saxon to be Secretary, and authorized the Company to issue 1,000 shares of common stock to his wife for $1 of consideration.[20]

During 2002, Will continued to act unilaterally as Genelux's sole director. Genelux hired its first scientist on July 1, 2002.[21] On July 15, the Board recommended the First Amended and Restated Certificate of Incorporation for stockholder approval, which fixed the number of Founders' Shares at 7.5 million.[22] In lieu of a stockholder meeting, holders of the necessary amount of stock (presumably Will's wife, who was the only stockholder of record at this point) submitted written consents approving the amendments. Will signed the amended certificate in his capacity as President and CEO on July 15, 2002, but the Company did not file the certificate until two months later on September 18.[23]

In the meantime, Will put Genelux's operations into motion by executing, or causing Genelux to execute, a number of organizational documents and contracts. On or about August 1, 2002, Genelux and Thomas executed a Credit Agreement requiring Thomas to extend to the Company a $50,000 line of credit and pay $1,500 cash in consideration for 1.5 million Founders' Shares, *i.e.*, Series A Preferred shares.[24] Genelux

---

[20]     *Id.*

[21]     Tr. 53 (Will).

[22]     JX 12.

[23]     *Id.*

[24]     JX 2.  Joint Exhibit 2 consists of signed minutes of the Board's unanimous written consent, Thomas's signed and dated Credit Agreement, Thomas's signed and

and Will's wife also executed a Credit Agreement requiring her to extend the Company a $100,000 line of credit and pay $3,000 cash in consideration for 3 million Founders' Shares.[25] Szalay, however, refused to execute a similar credit agreement that Will presented to him.[26] Notably, this agreement would have required Genelux to issue Szalay 3 million Founders' Shares in exchange for his extending a $50,000 line of credit to Genelux.[27]

Effective August 5, 2002, Genelux and Szalay executed an Asset Purchase Agreement, which the Board, *i.e.*, Will, authorized by unanimous written consent, requiring Szalay irrevocably to assign, convey, and transfer to Genelux all of his right,

---

dated Promissory Note, and Thomas's signed and dated Form of Restricted Preferred Stock Agreement reflecting his Founders' Shares. *Id.*

[25] JX 4. Joint Exhibit 4 consists of the same signed and dated documents contained in Joint Exhibit 2, which are identical in all material respects other than those stated above.

[26] JX 5. Joint Exhibit 5 consists of a credit agreement (absent its second page), a promissory note, and a form of restricted preferred stock agreement, each of which Szalay declined to sign.

[27] This unsigned credit agreement did not require Szalay to provide cash consideration, or transfer any assets to Genelux, for 3 million Founders' Shares, which contradicts Plaintiffs' position that signing the Asset Purchase Agreement entitled Szalay to 1.5 million Founders' Shares and signing the credit agreement entitled him to another 1.5 million Founders' Shares. Pls.' Opening Br. 6 ("It was contemplated that Dr. Szalay too would receive an additional 1.5 million shares of Series A preferred stock in consideration for his payment of par value and execution of a credit agreement."); Tr. 57-58 (Will) ("And he would have had to also purchase the shares in accordance with the credit agreement. So he would have to sign the credit agreement and buy the shares.").

13

title, and interest in and to certain defined assets[28] in exchange for 10,950,000 shares of common stock and 1.5 million Founders' Shares.[29] Similar to the credit agreement that Szalay did not sign, this Asset Purchase Agreement did not require Szalay to pay cash consideration. Also effective August 5, 2002, Genelux and three inventors, including Szalay, executed an Assignment and License Agreement requiring the inventors to assign certain patents and license certain know-how in consideration for 50,000 shares of common stock each, bringing Szalay's common stock ownership to 11 million shares.[30]

Effective September 1, the Board authorized by unanimous written consent the Company's offering memorandum for the sale of Series B Preferred stock at a price of $1 per share, which included a capitalization table reflecting that Szalay owned 11 million shares of common stock and 3 million Founders' Shares, Thomas owned 1.5 million

---

[28] JX 3. The assets to be transferred included: "(a) all items of laboratory equipment owned by [Szalay] . . . ; (b) all laboratory supplies, laboratory animals, cell lines, reagents and related research materials owned by [Szalay] . . . to the extent freely transferrable (subject to applicable contractual use restrictions); and (c) all items listed on the Asset Inventory attached hereto . . . ." *Id.*

[29] *Id.* Joint Exhibit 3 consists of signed minutes of the Board's unanimous written consent and Szalay's signed and dated Asset Purchase Agreement. Conspicuously absent, however, are signed and dated forms of agreement corresponding to Szalay's receipt of common stock or Founders' Shares. This contrasts with the three signed credit agreements (two by Will's wife, one by Thomas) and the Assignment and Licensing Agreement, defined in the text above, which all included forms of agreement that were signed and dated by the individuals receiving their respective shares of preferred or common stock. *See supra* notes 24-26 and *infra* notes 30, 32.

[30] JX 8. Joint Exhibit 8 consists of, among other things, the Assignment and License Agreement and three signed forms of restricted common stock agreements dated August 22, 2015.

14

Founders' Shares, and "Trusts f.b.o. Jason and Andrea Will" owned 3 million Founders' Shares.[31] Also effective September 1, 2002, however, Genelux and Will's wife executed a Supplementary Credit Agreement, which the Board (still only Will) authorized by unanimous written consent effective August 30, 2002, requiring Will's wife to extend to the Company a second line of credit of up to $50,000 and pay $1,500 cash in consideration for 1.5 million Founders' Shares.[32] In other words, notwithstanding the fact that the Company valued its Series B Preferred stock at $1 per share, Will contemporaneously caused the Company to sell his wife 1.5 million Founders' Shares at a price of $0.001 per share.

On September 12, 2002, Will sought to correct a mistake he apparently had made regarding Szalay's Asset Purchase Agreement.[33] With a transmittal sheet bearing Genelux's logo, Will faxed to Szalay's house a corrected first page of the Asset Purchase Agreement. The original agreement purportedly had granted Szalay only 10,550,000 shares of common stock. In the body of the transmittal sheet, Will wrote: "Since you decided not to sign the Credit Agreement, I needed to put an additional $50,000 into the

---

[31] JX 10. Will testified that this offering memorandum reported Szalay's and the Wills' stock ownership incorrectly because it was printed on glossy paper in August before Szalay refused to sign the credit agreement and it was too late to fix the error. Tr. 30.

[32] JX 9. Joint Exhibit 9 consists of signed minutes of the Board's unanimous written consent and Will's wife's signed and dated Supplementary Credit Agreement, signed and dated Promissory Note, and signed and dated Form of Restricted Preferred Stock Agreement reflecting the additional Founders' Shares. *Id.*

[33] JX 11.

company, so you have the remaining 1,500,000 shares of Series A Preferred [Founders' Shares]. As we discussed, you can expect to receive an additional 1,500,000 shares of common when your employment with Genelux begins, at which time your total number of shares will be the same as shown in the Offering Memorandum."[34]

These statements, however, contain several discrepancies and inconsistencies. For example, there is no stock certificate or entry on the stock transfer ledger reflecting that Szalay received initially only 10,550,000 shares of common stock. Furthermore, Szalay already held the 11 million shares of common stock as shown in the Offering Memorandum and stock transfer ledger. Based on these discrepancies and inconsistencies, I find that Will's actions were inconsistent with the Founders' agreement regarding the allocation of Founders' Shares. This conclusion is confirmed by the events discussed *infra*.

Finally, Genelux filed its First Amended and Restated Certificate of Incorporation with the Delaware Secretary of State on September 17, 2002. Precise meeting dates are unclear, but an email exchange in mid-January 2003 between Thomas and Will indicates

---

[34] JX 11. Will testified that Szalay brought to his attention that Szalay had not received the number of shares of common stock that were shown in the offering memorandum, which led Will to discover the typographical error in the Asset Purchase Agreement that Szalay had signed. Tr. 26. As discussed *infra*, however, Genelux alleged in a 2003 lawsuit against Will that the cover page stated incorrectly the number of Founders' Shares and that, after promising to correct the error, Will insisted that Szalay sign immediately the signature page of the incorrect agreement. *See, e.g.*, *infra* notes 45-46 and accompanying text.

16

that the Board had met twice by that time.[35]  At the first meeting, Will, Szalay, and Thomas were appointed to the Board, which then appointed Will as CEO, Szalay as CSO, and Thomas as CFO, allocated the Founders' Shares, and decided to move the Company to San Diego.  At the second meeting, a disagreement arose and the directors walked out without formally discussing or approving anything.  In the email, Thomas insisted that a third Board meeting be held on January 17, 2003 and that, in advance, Will provide, among other things, corporate documents, including the certificate of incorporation, bylaws, technology and equipment transfer documents, documents allocating shares, copies of all contracts, minutes of the first Board meeting, and the name of Company counsel.[36]

Only after Will provided Thomas with the requested documents did Thomas learn that Will had given Will's wife 1.5 million Founders' Shares in violation of the Founders' agreement to allocate 3 million, 3 million, and 1.5 million Founders' Shares to Will, Szalay, and Thomas, respectively.[37]  This discrepancy, among other things, became the subject of two lawsuits between, on the one hand, the Company, its Series B Preferred stockholders, Thomas, and Szalay, and, on the other, Will and his wife.

---

[35]     JX 13.

[36]     *Id.*

[37]     JX 17.

17

### 3.      The Wills Dispute and Settlement

The Founders disagree as to the exact reasons for the dispute leading to Will's separation from Genelux, but three documents created in 2003, and one created in 2004, provide contemporaneous evidence of what the Founders and Genelux believed at that time. Because Thomas and Szalay both dispute Will's authority to have caused Genelux to take many of its early acts, and because the documents arising from those acts appear to contain errors and reflect inconsistencies, I consider these four documents to be at least as reliable. Accordingly, I decline to rely solely on Will's testimony and the documents he created in 2002 to determine the nature of the claims at issue in the Wills Dispute and resolved by the Wills Settlement and consider the following four documents to be informative on that score.

First, Will wrote a letter to Szalay on Genelux letterhead dated April 23, 2003 announcing his resignation as CEO and Board member effective May 1, 2003.[38] Second, Thomas wrote an email to Jan Sundberg, Genelux's corporate counsel, on May 8, 2003, providing his understanding of the Founders' agreement and the ways in which Will had violated that agreement.[39] Third, on June 18, 2003, through its counsel, Loeb, Kosacz & Sundberg, LLP, Genelux filed a complaint against Will, Will's wife, and others (the "California Complaint") seeking declaratory and injunctive relief based on Will's alleged

---

[38]      JX 16.

[39]      JX 17.

18

breaches of fiduciary duty.[40]  Finally, on February 16, 2004, Thomas created a document summarizing the history of Genelux and providing the names of its corporate counsel and its auditor.[41]

In Will's resignation letter, he described his efforts to value independently and sell the Company's assets.[42]  Will purportedly hired Brian Testo Associates, LLC, Appraisers-Auctioneers-Liquidators, to review the inventory, inspect the equipment, and estimate its value.  The record, however, does not include the results of that review or any evidence substantiating that an appraisal actually was performed.  Will then met with Tavistock, a large venture capital fund with portfolio companies located in Genelux's building, to explore a possible business relationship.  Tavistock purportedly offered to purchase Genelux's assets, assume its lease, and assist in finding temporary employment for the employees within the building.  According to Will's letter, one hour after he provided Tavistock with a tour of the offices and laboratory, Szalay called Tavistock to inform them that Will did not have Board authorization to meet with them and the Company would not permit them to sublease its space, acquire any of its assets, or assist

---

[40]  Defs.' and Intervenor's Answering Br. Ex. A (the California Complaint) (*Genelux Corp. v. Will, et al.*, Case No. GIC813034 (Cal. Super. Ct. San Diego June 18, 2003)).  The Series B Preferred stockholders, organized and led by Simus, filed a second lawsuit in California, *Simus v. Will, et al.*, Case No. SCVSS108390 (Cal. Super. Ct. San Bernardino Oct. 1, 2003).

[41]  JX 20.

[42]  JX 16.

19

its employees. Thereafter, Tavistock rejected Will's proposal and Will resigned from Genelux claiming that Szalay had undermined his ability to perform as CEO.[43]

In his email to Sundberg, Thomas explained that Will had been representing to investors that he, Thomas, and Szalay were officers and directors of Genelux since September 2001 and had not disclosed that "a board of his family members" had given him an executive contract.[44] Thomas also reported that on August 1, 2002, Szalay had signed his patent and asset transfer documents and Thomas had signed a loan agreement giving the Company a $10,000 loan for his Founders' Shares. By September 30, 2002, however, Will had "fluffed off" 1.5 million Founders' Shares to Will's wife, who was never a part of the allocation. Thomas expressed displeasure that, after the Founders had agreed to a control structure designed to maintain the officers' independence from one controller, Will had given himself complete control of the Board and Company by issuing his wife 1.5 million of Szalay's Founders' Shares. Finally, Thomas accused Will of attempting to defraud the investors and patent holders to take over the intellectual property of the Company by valuing the Company's intellectual property in its financial statements at $150,000, but then devaluing it to $150 three months later. Notably,

---

[43]    At trial, Will testified that he left Genelux because Szalay had broken certain promises. Szalay allegedly had represented that the lab equipment he had assigned to Genelux was worth millions of dollars, but when Will had it appraised, it allegedly had a negative asset value due to the cost of storing hazardous material. Szalay also had promised to become an employee of Genelux but later refused, which meant he was not subject to any confidentiality agreement. Tr. 33-35.

[44]    JX 17.

Thomas never said in his email that the Founders had agreed to sign credit agreements as a condition to receiving their allocation of Founders' Shares. The contents of Thomas's email appear to have provided the basis for the California Complaint that Genelux filed against Will the next month.

The Company filed the California Complaint on June 18, 2003, accusing Will of secretly issuing 1.5 million Founders' Shares—and ceding control of the Company—to his wife for nominal consideration, secretly entering into an employment contract with himself on terms detrimental and damaging to Genelux and its stockholders, and secretly employing his wife for a starting salary of $75,000 per year.[45] More important to this action, however, are the allegations in the California Complaint that provide more background to the credit agreements than any other documents in the record. According to the California Complaint, the Founders agreed at an August 1, 2002 board meeting that Szalay, Will, and Thomas would receive 3 million, 3 million, and 1.5 million Founders' Shares, respectively. At the same meeting, the Founders agreed to issue Szalay 11 million shares of common stock in consideration for more than $100,000 that Szalay had already lent to Genelux and for his agreement to transfer his intellectual property, equipment, and gene strands to Genelux. Finally, the Founders also agreed that when Genelux needed additional working capital, Will would lend the Company up to $100,000 on an "as needed" basis, after which Thomas would lend $50,000 "as needed,"

---

[45] Cal. Compl. ¶ 6. The California Complaint also accused Will's wife of aiding and abetting Will in his breaches. *Id.* ¶ 7.

after which Szalay would lend up to $100,000 "as needed." Instead, Will presented Szalay with an unconditional credit agreement that Szalay refused to sign. When Will later presented Szalay with an Asset Purchase Agreement granting Szalay 1.5 million Founders' Shares and 10,950,000 shares of common stock, the California Complaint alleges that Szalay pointed out that the Founders previously had agreed that Szalay would receive 3 million Founders' Shares. Will allegedly agreed to fix the error, but purportedly attempted to have Szalay execute the signature page immediately by explaining that he would correct the number of shares later. Finally, the California Complaint alleges that, after Will faxed Szalay the purported correction of the Asset Purchase Agreement substituting 1.5 million shares of common stock for the second 1.5 million Founders' Shares to which Szalay was entitled, Szalay confronted Will about the share allocation. Szalay allegedly stated that Will did not have Board approval to change unilaterally the capital structure and that Szalay's 3 million Founders' Shares were owed as consideration for Szalay having lent the Company over $100,000 and transferred valuable intellectual property and equipment purportedly worth several million dollars.[46]

Finally, on February 16, 2004, Thomas created a chronology of activities related to Genelux as he understood them for whoever succeeded him as CFO.[47] Although the

---

[46] I do not consider the facts alleged in the California Complaint to be conclusive evidence. Rather, I take judicial notice of the California Complaint as evidence of the positions Genelux, the plaintiff in both the California action and this case, took at that time.

[47] JX 20; *see also* Tr. 165 ("This document was created because I was leaving the company. I was taken out of the company as the CFO. So I was giving this to

chronology misstates the dates of Genelux's incorporation and the filing of its First Amended and Restated Certificate of Incorporation, it is otherwise consistent with the evidence discussed above regarding the Founders, original Board members, officer appointments, and Founders' Share allocation.

Both actions against the Wills, one filed by Genelux and the other by Simus and the Series B Preferred stockholders, were settled on November 20, 2003. Pursuant to the Wills Settlement, all shares of stock held by the Wills, including 4.5 million shares of Series A Preferred stock, were transferred to Genelux, and the named plaintiffs from both actions released all claims against the Wills.[48]

### 4.      Szalay pursues his claim to the Disputed Shares

Szalay again raised his claim to the Disputed Shares at a meeting of the Company's strategic planning committee on November 20, 2004.[49] At trial, Sundberg testified that he and his colleague, Paul Kosacz, who were both corporate counsel and members of the committee, walked out of the meeting after Szalay initiated a "heated" discussion about the Company issuing him an additional 1.5 million Founders' Shares.[50]

---

whoever wanted to run the company, mentioning the auditor, mentioning who the corporate counsel were and the different facts as I saw it."). Although Thomas testified that he created the document in part to assist the Company in its lawsuit against the Wills, the document itself states that the lawsuit was settled two months before Thomas created the document.

[48]     JX 18.

[49]     JX 25.

[50]     Tr. 224.

23

Sundberg and Kosacz took issue with this demand because the Company was in the middle of its Series C private placement, which included a private placement memorandum stating that Szalay and Thomas each owned 1.5 million Founders' Shares, and informed the committee that they could not continue as counsel for the Company in light of Szalay's request. Two directors, possibly including Simus, joined Sundberg and Kosacz in the hallway ten minutes later. The directors informed Sundberg and Kosacz that they had convinced Szalay to withdraw his claim and, after a brief discussion, Sundberg and Kosacz agreed to rejoin the meeting.[51]

On or about December 11, 2005, Genelux issued to Szalay 1.5 million shares of common stock (the "2005 Issuance").[52] Plaintiffs dispute the validity of this issuance on the grounds that there is no writing evidencing that the Board authorized it. Relying on the Company, which controls the documents and represented that there is no Board resolution authorizing the issuance, Szalay conceded at argument that the issuance presumably is defective.[53] Based on my examination of the record in this action, however, I find that the Board meeting minutes dated December 18, 2009 provide written evidence that the Board did authorize the 2005 Issuance both in 2005 and again in 2009.[54]

---

[51]    *Id.* at 226-27 (Sundberg).

[52]    JX 100, at 4.

[53]    June 24, 2015 Arg. Tr. ("June 24 Tr."), Docket Item ("D.I.") 105, at 58.

[54]    JX 58.

At a December 18, 2009 Board meeting attended by Szalay, Simus, Thomas, Zindrick, and others, upon a motion duly made and seconded, the Board approved unanimously (that is, including Simus, a Plaintiff in this case) certain recitals and resolutions, drafted by Latham—*i.e.*, counsel for both Plaintiffs in this case—that were attached to the minutes as Appendix A, under the heading "Stock Plans."[55]  Two subsections of the resolutions, titled "Ratification of 2005 Stock Plan" and "Ratification of Grants of Restricted Stock under the 2005 Stock Plan," describe the circumstances that led the Board to adopt the included resolutions on that date.  The first explains that the Board approved the adoption of the 2005 Plan on January 10, 2005 and that the stockholders of the Company approved the adoption of the 2005 Plan on September 21, 2005.  Nevertheless, the subsection continues that, "*as a result of the loss or inadvertent destruction of corporate records evidencing the approval and adoption of the 2005 Plan*," the Board deemed it to be advisable and in the best interests of the Company and its stockholders to ratify the adoption of the plan[56] and resolved to "ratify, confirm and approve the adoption of the 2005 Plan . . . ."[57]  Again, the Board adopted these resolutions unanimously.

The second subsection explains that, pursuant to the 2005 Plan, a committee consisting of Szalay, Roeder, and Simus had been formed to administer the plan.  On

---

[55]     *Id.* at 2, Appx. A ("Dec. 18 Resolutions").

[56]     Dec. 18 Resolutions 6 (emphasis added).

[57]     *Id.* at 7.

25

March 1, 2005, the committee met and approved the grant, among others, of 1.5 million restricted shares to Szalay.[58] The December 18 Resolutions further state that: "*as a result of the loss or inadvertent destruction of corporate records evidencing the approval of the grant of Restricted Shares to the individuals and in the amounts listed above*, the Board, comprising the entire Committee formed to administer the 2005 Plan," deemed it to be advisable and in the best interests of the Company and its stockholders to ratify the approval of the grant previously approved by the committee;[59] and resolved to ratify, confirm, and approve the grants of stock previously approved by the committee effective as of March 1, 2005, and further confirmed that such shares are duly authorized, validly issued, fully paid, and non-assessable.[60] Once more, the Board adopted these resolutions unanimously. The Company's stock transfer ledger confirms that the Company issued 1.5 million shares of common stock to Szalay on December 11, 2005,[61] and Szalay's

---

[58]  *Id.* The committee approved grants of Restricted Shares (as defined in the 2005 Plan) to the following individuals (with the number of shares listed in parentheses): Shahrokh Shabahang (725,000); Louis Stromberg (675,000); Ronald Simus (850,000); Yong Yu (400,000); Qian Zhang (400,000); Tom Hagood (12,000); Aladar Szalay (1,500,000); and Albert Roeder (1,300,000). *Id.*

[59]  *Id.* (emphasis added).

[60]  *Id.*

[61]  JX 100.

26

corresponding stock certificate confirms the number and type of shares issued to him on that date.[62]

Because Szalay received shares of common stock in 2005, he later pursued converting those shares to Founders' Shares. On February 27, 2007, according to meeting minutes prepared by Dr. Shahrokh Shabahang, a vote approving the replacement of the 1.5 million shares of common stock that Szalay received in December 2005 with the Disputed Shares took place by motion made by Simus during a Special Meeting of the Board. Plaintiffs challenge the validity of the Board vote. The minutes state: "The final item on the agenda was the incorrect handling of Dr. Szalay's 1.5M Series A [Founders' Shares] which were not returned to him following removal of the previous CEO and later compensated for by allocation of 1.5M common shares."[63] Szalay abstained from the discussion and voting, and Simus chaired that portion of the meeting. When Thomas inquired as to whether the correction was a plan to remove him from the Board, Simus replied that it was not about Board seats, but about a mistake that required correcting. Simus moved to replace Szalay's 1.5 million shares of common stock with 1.5 million Founders' Shares, and the motion was duly seconded and approved by Roeder, Simus, and Dr. Friedrich Kapp over Thomas's lone vote against.[64] Because steps

---

[62] JX 101. Accordingly, I reject Plaintiffs' argument that the December 18 Resolutions ratified a grant of options, rather than shares of common stock. Pls.' Opening Br. 27 n.4.

[63] JX 30.

[64] *Id.*

27

necessary to effectuate this Board action were never taken, however, Szalay's 1.5 million shares of common stock were not replaced with the 1.5 million Founders' Shares to which he claimed he was entitled.

Szalay next attempted to satisfy his claim to the Disputed Shares in 2009. On April 24, 2009, Szalay sent a letter to Genelux stockholders requesting their response and action by written consent on certain items, including the "[c]orrection of shares allocated in error to Aladar Szalay as Common Stock rather than as Series A Preferred Stock," and the adoption of a proposed Fifth Amended and Restated Certificate of Incorporation, in the form of an Action by Written Consent of the Stockholders of Genelux Corporation dated April 24, 2009.[65] Latham prepared the Written Consent and drafted the proposed Fifth Amended and Restated Certificate of Incorporation. On May 7, 2009, Thomas voted his 1.5 million Founders' Shares against Szalay's proposal regarding the "correction" of certain share issuances and against the adoption of the Fifth Amended and Restated Certificate of Incorporation.[66] But, Kevin T. Murphy, Corporate Secretary of Genelux, signed a document dated August 5, 2009, which indicated, incorrectly, that the Written Consent was passed by the relevant Genelux stockholders.[67]

---

[65] JX 41.

[66] *Id.*

[67] *Id.*

### 5. The Abbott Negotiations and 2009 Issuance

Sometime in 2009, Genelux began negotiating with Abbott regarding a potential $25 million investment in Genelux and retained Latham in connection with that investment.[68] Vandeman, a former Latham partner, led the negotiations on behalf of Genelux for a time and Tyree, now Chairman of Genelux, led the negotiations on behalf of Abbott.[69] By December 2009, Zindrick, now President and CEO of Genelux, had taken over as Genelux's lead negotiator on the Abbott Deal.[70] On December 15, 2009, he advised Szalay that Abbott required "certain conversion/liquidation rights to be set prior to issuance of the stock and insists that a new, revised Certificate of Incorporation be approved and filed before closing."[71] Three days later, the Board held a meeting to consider resolutions relating to, among other things, approving a proposed Sixth Amended Certificate, reviewing the Company's stock books, Board minutes, stockholder approvals, and related materials to confirm the accuracy and completeness of the Company's capitalization records, and resolving Szalay's claim to the Disputed Shares.[72]

During the December 18, 2009 Board meeting discussed *supra*, the Board apparently acted without knowledge that their efforts to adopt the Fifth Amended

---

[68]     Tr. 130, 138-39 (Thomas).

[69]     Tr. 402-03 (Vandeman).

[70]     Tr. 283-84 (Zindrick).

[71]     JX 55.

[72]     JX 58.

Certificate in May were ineffective. The Board purported to adopt a resolution, drafted by Latham, that, in part, stated that the Board had determined that 1.5 million shares of common stock previously "were issued in error to Aladar Szalay in lieu of" 1.5 million Founders' Shares and that "in recognition of the previous error the Board deems it advisable and in the best interests of the Company to issue [1.5 million Founders' Shares] to Aladar Szalay in consideration for the cancellation of [1.5 million shares of common stock in issue] currently held by Aladar Szalay."[73] This resolution was invalid, however, because the stockholders had not passed the May amendment that was intended to increase the number of authorized Founders' Shares from 3 million to 4.5 million.

Genelux's corporate counsel, Cheston Larson of Latham, attended the December 18 meeting along with Szalay, Thomas, Simus, and Zindrick and, after Thomas informed him that the prior certificate had never been amended, Larson advised Zindrick that he should not file the Sixth Amended Certificate purportedly approved at the meeting before resolving the dispute between Szalay and Thomas regarding the Founders' Shares. Larson explained that increasing the authorized Founders' Shares from 3 million to 4.5 million required the approval of a majority of the outstanding Founders' Shares.[74] Because Thomas recently had voted against such a proposal, Larson advised that either Szalay could convince Thomas to approve the amendment or simply not increase the

---

[73]     JX 58.

[74]     JX 61. As discussed *infra*, this advice turned out to be incomplete.

number of authorized Founders' Shares.[75] Central to Plaintiffs' claims in this action is their contention that Szalay misrepresented that Abbott was requiring Genelux to resolve Szalay's claim to the Disputed Shares before going ahead with its investment.

On December 22, 2009, Zindrick emailed to Thomas a Written Consent that, if signed, would: (1) approve the Fifth Amended Certificate, which increased the number of authorized Founders' Shares to 4.5 million; and (2) satisfy Szalay's claim to the Disputed Shares by cancelling the 1.5 million shares of common stock and issuing Szalay 1.5 million Founders' Shares.[76] Thomas explained to Zindrick why Thomas opposed signing the consent, but Zindrick and others at the Company told Thomas the Abbott Deal was contingent on him signing the consent.[77] On December 23, 2009, Thomas executed the Written Consent completing the authorization for the Board to issue the Disputed Shares to Szalay (the "2009 Issuance").[78] On January 7, 2010, the Company filed its Fifth Amended and Restated Certificate of Incorporation with the Delaware Secretary of State, after which the Company converted Szalay's 1.5 million shares of common stock to 1.5 million Founders' Shares.[79]

---

[75]     *Id.*

[76]     JX 112.

[77]     Tr. 175-76, 178-79 (Thomas).

[78]     JX 62, 66.

[79]     JX 100.

Genelux and Abbott entered into the Series I Preferred Stock Purchase Agreement in January 2010.[80] Having reviewed carefully the documentary and testimonial evidence, although not always entirely consistent, it appears by a preponderance of the evidence that various parties took steps in December 2009 to convert the 1.5 million shares of common stock Szalay received on December 11, 2005 to 1.5 million Founders' Shares.

### C.      Procedural History

On August 15, 2014, Genelux filed its Verified Petition for Relief pursuant to 8 *Del. C.* § 205 to invalidate the 1.5 million Disputed Shares "improperly issued" to Szalay.   The Company alleged that, in 2005, Szalay issued to himself 1.5 million shares of common stock that the Company later purported to convert to 1.5 million Founders' Shares in 2009.  The Company also alleged that, for most of the time that Szalay held the positions of CEO, President, and Chairman of the Board, and up to May 2, 2014, the majority of the Board consisted of Genelux employees, subject, by virtue of their employment, to manipulation and control by Szalay.  Thus, according to the Petition, the Company did not discover Szalay's wrongdoing until the Board was reconstituted and became fully independent following Szalay's removal in May 2014 and conducted a comprehensive review of Genelux's financials and operations.

On August 20, 2014, Genelux filed a Verified Amended Petition for Relief Pursuant to 8 *Del. C.* § 205 and Complaint Pursuant to 8 *Del. C.* § 225 (the "Complaint"),

---

[80]      JX 64.  Abbott invested approximately $5 million in Genelux as opposed to the $25 million discussed originally.

adding Simus as a Plaintiff and a Section 225 claim against Roeder and Georgiou. Simus verified the Complaint in his individual capacity and on behalf of Genelux. This amended Complaint is substantially similar to the original, but adds facts surrounding the August 15, 2014 Annual Meeting at which Szalay purported to vote his Disputed Shares in favor of Roeder and Georgiou, whose Board seats Simus and Genelux contest.

Plaintiffs filed a motion to expedite on August 22, 2014, which I granted on October 7, 2014. I set a two-day trial for December 2014.

Szalay moved to intervene on October 31, 2014. After granting that motion on November 5, I rescheduled trial for January 2015. On November 26, 2014, Defendants moved to compel custodian searches, dismiss Genelux as an improper plaintiff, and disqualify Latham and RLF. Plaintiffs opposed this motion on December 8, and I held a hearing on it on December 18, 2014. Before the hearing, Plaintiffs agreed to search the requested custodians and Genelux effectively withdrew from the Section 225 claim. At the hearing, I denied the motion to disqualify Latham and RLF and focused on whether Genelux could remain in the case as Plaintiff for the Section 205 claim. Ultimately, I deferred my decision on the Section 205 issue until after the impending trial.

On December 23, 2014, Defendants filed a Motion to Dismiss Plaintiffs' Verified Amended Complaint with Prejudice Pursuant to Court of Chancery Rule 41(b), for Sanctions and for Immediate Suspension of These Proceedings and Postponement of the Trial Date Pending Resolution of this Motion, arguing that Simus had filed a false verification as to the Complaint. In particular, Simus's verification stated, "I have read the foregoing Verified Amended Petition for Relief Pursuant to 8 *Del. C.* § 205 and

33

Complaint Pursuant to 8 *Del. C.* § 225 and know the contents thereof." At his deposition, however, Simus admitted that he had not read the Complaint and disclaimed knowledge of core facts alleged therein.[81] Plaintiffs opposed Defendants' motion, arguing that the relevant standard had not been met for dismissal with prejudice and submitting a new affidavit in which Simus swore he had reviewed portions of an earlier draft of the Complaint. In response to that motion, I: (1) rescheduled the January trial date; (2) scheduled a hearing on January 29, 2015, on the Rule 41(b) motion and ordered Plaintiffs to produce certain documents evidencing that they had emailed the Complaint, or a draft thereof, to Simus; (3) denied without prejudice the aspect of Defendants' motion that sought dismissal of the entire case with prejudice for want of a more complete record; and (4) stated my intent to sanction Plaintiffs for failing to exercise sufficient care with respect to the verification.

On February 5, 2015, I rescheduled trial in this matter for April 7-8, 2015. That same day, however, Szalay filed a separate complaint seeking indemnification and advancement from Genelux (the "Advancement Action") and moved to expedite those proceedings. Genelux both opposed the motion to expedite and moved to consolidate the Advancement Action with this case on February 18. Szalay opposed consolidation and, on February 26, 2015, filed a motion for summary judgment on his advancement claim. Genelux promptly opposed that motion.

---

[81]    Simus Dep. 6.

On March 4, 2015, Defendants moved to compel access to Simus's laptop computer so they could have it examined by a forensic expert to confirm whether Simus had opened and read the Complaint as he claimed. In opposing that motion, Plaintiffs' counsel reported that Simus had discarded his laptop and would not be able to produce it. On March 19, Defendants responded by effectively renewing their Rule 41(b) motion to dismiss based on a claim of spoliation, which Plaintiffs opposed.

On April 2, 2015, I ordered, among other things, that Plaintiffs pay up to $10,000 of the reasonable attorneys' fees and expenses Defendants incurred in connection with their December 23 motion to dismiss based on Simus's alleged filing of a false verification.

Also on April 2, 2015, I granted in part Genelux's motion to consolidate this action with Szalay's Advancement Action to the extent that the parties wished to present additional evidence regarding Szalay's motion for summary judgment at the trial in this action and denied the motion to consolidate in all other respects. In that regard, I also granted in part Szalay's motion to expedite with respect to his motion for summary judgment by ordering the completion of briefing on that motion within a few weeks after the completion of the trial. In all other respects, the motion to expedite was denied.

I presided over a trial of this matter from April 7 to April 8, 2015. After the parties filed their post-trial briefs, I heard argument on June 24. This Opinion constitutes my post-trial findings of fact and conclusions of law in this matter.

Having considered the briefing submitted by the parties on Szalay's motion for summary judgment in the Advancement Action and the evidence adduced at the trial of

this action, I have determined that no oral argument is necessary on that motion. Accordingly, I am entering concurrent with this Opinion a Letter Opinion on the summary judgment motion and a separate order setting forth the procedure for seeking payment of advancement in the Advancement Action.

### D.    Parties' Contentions

Plaintiffs seek a declaration pursuant to 8 *Del. C.* § 205 that the purported issuance of 1.5 million shares of common stock to Szalay in 2005 was invalid and, therefore, that the purported conversion of these shares into Founders' Shares in 2007 and 2009 were void. Also, Plaintiff Simus seeks a declaration pursuant to 8 *Del. C.* § 225 that neither Roeder nor Georgiou was validly elected as a director of Genelux at the August 15 Annual Meeting. In support, Plaintiffs argue that the Disputed Shares are invalid because: (1) their issuance in 2009 lacked consideration; (2) the 2009 issuance lacked consideration because the shares of common stock that Genelux purported to convert were themselves invalid; and (3) the shares of common stock purportedly issued to Szalay in 2005 were neither authorized by the Board nor paid for by Szalay. Plaintiffs further deny that Szalay ever had a legitimate claim to the Disputed Shares and argue that, even if he did, the Wills Settlement extinguished any such claim. Finally, Plaintiffs contend that, to the extent the 2009 Issuance was valid, this Court should invalidate it because Szalay accomplished the 2009 Issuance by fraud or misrepresentation.

In opposition to the relief Plaintiffs seek, Defendants argue that Plaintiffs' Section 205 claim fails to state a claim as a matter of law, or, in the alternative, that Plaintiffs' invocation of Section 205 under the circumstances here should be barred on equitable

36

principles. Defendants also assert various affirmative defenses, averring that the statute of limitations and one or more of the equitable doctrines of estoppel, acquiescence, and laches bar Plaintiffs' challenges to the validity of Szalay's ownership of the Disputed Shares, and that Plaintiffs failed to allege or establish facts demonstrating any fraudulent concealment that would warrant tolling the applicable statute of limitations. Plaintiffs respond that barring their claims on any of these grounds would be inequitable and inappropriate because neither Simus nor any other director had knowledge of the material facts underlying the acts at issue until, at the earliest, June 2014.

Defendants also contend that I should dismiss this case with prejudice because Plaintiffs have compromised the integrity of these proceedings in various ways. In particular, Defendants argue that Genelux's recruitment of Simus to serve as Plaintiff on the Section 225 claim violates Sections 225(a) and (b) or is otherwise inequitable, Simus's false verification and subsequent spoliation of evidence warrant dismissal of this case with prejudice, Latham's representation of Genelux and Simus against Szalay constitutes a conflict of interest that is materially prejudicial to Szalay, and Genelux's failure to satisfy its mandatory advancement obligation to Szalay was materially prejudicial to Szalay's ability to prepare adequately for trial. Plaintiffs purport to refute these contentions on various grounds discussed *infra*.

Finally, in their post-trial briefing, Plaintiffs raised for the first time a technical challenge to the validity and effectiveness of the 2009 Issuance, arguing that the Court should invalidate this issuance as defective because the Company failed to satisfy the notice requirements of its Fourth Amended Certificate, which notice Section 228(e) of

the DGCL requires. Defendants oppose this argument on two grounds. First, Defendants contend that Plaintiffs waived this argument by failing to raise it in their pleadings, interrogatory answers, pretrial order, or pretrial brief. Instead, Defendants asserted this technical deficiency for the first time in their post-trial brief. Second, Defendants argue that the alleged failure of notice does not make the act void, but rather only unenforceable until notice is actually given, which condition was satisfied when Plaintiffs noticed the August 15, 2014 Annual Meeting.

## II.  ANALYSIS

### A.  Preliminary Matters of Law and Equity

A threshold issue in this case is whether Plaintiffs may use 8 *Del. C.* § 205 to invalidate defective corporate acts. Also, Defendants assert that Plaintiffs' use of Section 205 is inequitable under the circumstances here. I organize my analysis of these issues as follows. First, I determine whether Section 205 permits Plaintiffs to challenge the validity or effectiveness of the 2005 and 2009 Issuances. Second, I discuss whether Plaintiffs can use Section 205 to grant itself standing, in effect, under Section 225.

### 1.  Plaintiffs cannot use Section 205 to invalidate defective corporate acts

When the Court "is faced with a novel question of statutory construction, as here, [it] 'must seek to ascertain and give effect to the intention of the Legislature as expressed in the Statute itself.'"[82]  In doing so, the Court must "give the statutory words their commonly understood meanings" and "read and examine the text of the act and draw

---

[82]  *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 230 (Del. 1982) (quoting *Keys v. State*, 337 A.2d 18, 22 (Del. 1975)).

inferences concerning the meaning from its composition and structure."[83]    "When ambiguity exists in a statute, there is judicial discretion to construe it according to general standards of statutory interpretation and construction."[84]   But "[w]here the words of the statute are plainly expressive of intent, not rendered dubious by the context the interpretation must conform to and carry out that intent."[85]   Moreover, "[t]he Legislative body is presumed to have inserted every provision for some useful purpose and construction . . . ."[86]   Thus, the "Court may not assume that an omission 'was the result of an oversight on the part of the General Assembly.'"[87]   Finally, it is well settled under Delaware law that "[a] court should not resort to legislative history in interpreting a statute where statutory language provides unambiguously an answer to the question at hand."[88]

Effective April 1, 2014, Section 205 confers on the Court of Chancery exclusive jurisdiction to hear a petition brought by a corporation or other enumerated party to "determine the validity of" or to "ratify" a corporate act or stock that, but for the statute,

---

[83]   *Id.* (citing *Moore v. Chrysler Corp.*, 233 A.2d 53, 55 (Del. 1967)); *Klotz v. Warner Comm'ns, Inc.*, 674 A.2d 878, 879 (Del. 1995) (quoting NORMAN J. SINGER, 2A SUTHERLAND STATUTORY CONSTRUCTION § 47.01 (5th ed. 1992)).

[84]   *Gen. Motors Corp. v. Burgess*, 545 A.2d 1186, 1191 (Del. 1988) (internal quotation marks omitted).

[85]   *Fouracre v. White*, 102 A. 186, 200 (Del. Super. 1917).

[86]   *C & T Assocs., Inc. v. Gov't of New Castle Cty.*, 408 A.2d 27, 29 (Del. Ch. 1979).

[87]   *Burgess*, 545 A.2d at 1191 (quoting *Giuricich*, 449 A.2d at 238).

[88]   *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1287 (Del. 1994).

would otherwise be considered defective and incurable.[89]   Upon application by an

enumerated party, Section 205 allows the Court of Chancery to:

> (1) Determine the validity and effectiveness of any defective corporate act ratified pursuant to § 204 of this title; (2) Determine the validity and effectiveness of the ratification of any defective corporate act pursuant to § 204 of this title; (3) Determine the validity and effectiveness of any defective corporate act not ratified or not ratified effectively pursuant to § 204 of this title; (4) Determine the validity of any corporate act or transaction and any stock, rights or options to acquire stock; and (5) Modify or waive any of the procedures set forth in § 204 of this title to ratify a defective corporate act.[90]

Section 205(b) proceeds to list several categories of relief that this Court is authorized to

issue under the statute.  The relevant provisions cast the relief in the affirmative:

> (b) In connection with an action under this section, the Court of Chancery may: . . . (2) Validate and declare effective any

---

[89]   8 *Del. C.* § 205(a), (e).  The enumerated parties besides a corporation are any successor entity to the corporation, any member of the board of directors, any record or beneficial holder of valid stock or putative stock, any record or beneficial holder of valid or putative stock as of the time of a defective corporate act ratified pursuant to Section 204, or any other person claiming to be substantially and adversely affected by a ratification pursuant to Section 204.  *Id.* § 205(a).

[90]   *Id.* § 205(a).  Section 204 defines "defective corporate act" as "an overissue, an election or appointment of directors that is void or voidable due to a failure of authorization, or any act or transaction purportedly taken by or on behalf of the corporation that is, and at the time such act or transaction was purportedly taken would have been, within the power of a corporation . . . but is void or voidable due to a failure of authorization."  *Id.* § 204(h)(1).  Also, "failure of authorization" means "the failure to authorize or effect an act or transaction in compliance with the provisions of this title, the certificate of incorporation or bylaws of the corporation, or any plan or agreement to which the corporation is a party, if and to the extent such failure would render such act or transaction void or voidable."  *Id.* § 204(h)(2).

40

defective corporate act or putative stock and impose conditions upon such validation by the Court; . . . (5) Approve a stock ledger for the corporation that includes any stock ratified or validated in accordance with this section or with § 204 of this title; (6) Declare that shares of putative stock are shares of valid stock or require a corporation to issue and deliver shares of valid stock in place of any shares of putative stock; . . . (8) Declare that a defective corporate act validated by the Court shall be effective as of the defective corporate act or at such other time as the Court shall determine; . . . and (10) Make such other orders regarding such matters as it deems proper under the circumstances.[91]

Finally, in addition to setting out certain notice requirements, among other things, Section 205(d) provides a non-exclusive, non-mandatory list of factors the Court may consider in connection with a petition under Section 205, all of which are focused on the validation (not invalidation) of stock:

> (1) Whether the defective corporate act was originally approved or effectuated with the belief that the approval or effectuation was in compliance with the provisions of this title, the certificate of incorporation or bylaws of the corporation; (2) Whether the corporation and board of directors has treated the defective corporate act as a valid act or transaction and whether any person has acted in reliance on the public record that such defective corporate act was valid; (3) Whether any person will be or was harmed by the ratification or validation of the defective corporate act, excluding any harm that would have resulted if the defective corporate act had been valid when approved or effectuated; (4) Whether any person will be harmed by the failure to ratify or validate the defective corporate act; and (5) Any other factors or considerations the Court deems just and equitable.[92]

---

[91] *Id.* § 205(b).

[92] *Id.* § 205(d).

Plaintiffs argue that, because Section 205(a)(4) authorizes this Court, "upon application by the corporation," to "[d]etermine the validity of any corporate act or transaction and any stock, rights or options to acquire stock," it is inherent within that grant of power to "determine the validity" of "any stock" that the Court would have the ability to render a judgment that the stock subject to such a determination is invalid. Defendants disagree, arguing that viewing that phrase in a vacuum ignores the overall structure of the statute, which makes clear that the relief available under Section 205 is the validation of presumed defective and otherwise incurable acts (which the Court can then grant or deny), not the invalidation of acts presumed for years by a company or a stockholder to be valid. Defendants contend further that, because Section 205 has no relevant statute of limitations,[93] any other reading would put all stockholders at risk of having their equity positions challenged under any "theory" of wrongdoing and at any time, no matter when their shares were issued. That, Defendants assert, would be a perverse result, which Delaware courts avoid.[94]

---

[93] Section 205(f) provides a 120-day time limit for certain actions asserting a technical challenge to a ratification attempted under Section 204(b) and certain actions petitioning this Court to declare in its discretion whether a ratification attempted in accordance with Section 204 is not effective or is effective only on certain conditions. *Id.* § 205(f). Section 205(f) is inapposite here, however, because the parties did not raise a Section 204 issue.

[94] *See, e.g.*, *Spielberg v. State*, 558 A.2d 291, 293 (Del. 1989) ("The statute must be viewed as a whole, and literal or perceived interpretations which yield mischievous or absurd results are to be avoided.").

42

When I read Section 205(a)(4) in isolation, as Plaintiffs insist I do, the statute appears to enable Plaintiffs to petition this Court to determine the validity of *any* corporate act or transaction and *any* stock, rather than only defective corporate acts or transactions and defective stock. When read both as a whole and together with Section 204, however, Section 205 also appears to provide enumerated plaintiffs and the Court with a mechanism to eliminate equitably any uncertainty regarding the validity of arguably defective corporate acts by *validating* those acts, not invalidating them. Therefore, even if I assume Plaintiffs' interpretation of Section 205 is reasonable, I am convinced that Defendants' interpretation is also reasonable.[95] Accordingly, I find Section 205 ambiguous and look to outside sources to give context to the statute's intended meaning.

The authors of a respected treatise on Delaware corporation law and practice noted succinctly that Sections 204 and 205 "bring clarity to an often confusing area of Delaware law[, *i.e.*,] which [defective] corporate actions are voidable (and, therefore, may be capable of ratification) and which corporate actions are void (and, therefore, may be incapable of ratification)."[96] In that respect, as explained in this Court's decision in *In re Numoda Corp. Shareholders Litigation*, "[t]he legislation thus empowers the Court to

---

[95] "[A statute] is ambiguous if it is susceptible of two reasonable interpretations." *Taylor v. Diamond State Port Corp.*, 14 A.3d 536 (Del. 2011) (citing *Dewey Beach Enters., Inc. v. Bd. of Adjustment*, 1 A.3d 305, 307 (Del. 2010)).

[96] DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 8.03A[a] at 8-72 (2014).

43

grant an equitable remedy for corporate acts that once would have been void at law and unreachable in equity."[97]

Contributing to this "confusion" were the decisions in *STAAR Surgical Co. v. Waggoner*[98] and *Blades v. Wisehart*.[99]   In the *STARR Surgical* case, the Delaware Supreme Court held that certain shares of preferred stock were void because the board failed to comply with Section 151(g), which requires a corporation to file a certificate of designation when the certificate of incorporation permits the board to issue new securities through a resolution "adopted by the board."[100]   In *Blades*, this Court held that because the shares allegedly held by the defendants were not issued validly (because they did not conform precisely to the requirements of Section 242) and were thus void, the plaintiffs were the only ones with validly issued shares.   Thus, the plaintiffs had the power to execute the challenged written consent that sought to remove the defendants from their directorships.[101]

The legislative synopsis of House Bill 127, which became new Sections 204 and 205, itself states that the new statutes were enacted in response to and for the purpose of

---

[97]   2015 WL 402264, at *7 (Del. Ch. Jan. 30, 2015) (citations omitted).

[98]   588 A.2d 1130 (Del. 1991).

[99]   2010 WL 4638603 (Del. Ch. Nov. 17, 2010).

[100]   *STARR Surgical*, 588 A.2d at 1136.   The fact that the board "never formally adopted" a resolution or a certificate of designation led the Court in *STARR Surgical* to conclude that the preferred shares were void.   *Id.*

[101]   *Blades*, 2010 WL 4638603, at *1, 8-9.

44

abrogating the decisions in *STARR Surgical* and *Blades* so as to avoid their draconian effects.[102]  In passing the new statute, the Delaware Legislature apparently did not intend to enhance by statute the powers of the Delaware courts to set aside or invalidate a defective corporate act or stock—as that could be done before the statutes were passed and still can be done today.[103]  Rather, the new amendments provide a means to cure technically defective acts or stock.

Section 205 was intended to be a remedial statute designed, in conjunction with Section 204, to cure otherwise incurable defective corporate acts, not a statute to be used to launch a challenge to stock issuances on grounds already available through the assertion of plenary-type claims based on alleged breaches of fiduciary duty or common

---

[102]   *See* H.B. 127, 147th Gen. Assem. § 4 (2013); *see also In re Numoda Corp.*, 2015 WL 402265, at *8 ("An important goal [of H.B. 127] was to facilitate correction of mistakes made in the context of a corporate act without disproportionately disruptive consequences.") (citing C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 BUS. LAW. 393, 393-94, 399-401 (2014)); 1 DAVID A. DREXLER, LEWIS S. BLACK, JR., & A. GILCHRIST SPARKS III, DELAWARE CORPORATION LAW AND PRACTICE § 12.08 at 17-34 (2014) ("[T]hese sections provide a statutory safe harbor to rectify past unauthorized acts, and, in doing so, abrogate the holdings of cases such as [*STARR Surgical*] and [*Blades*] if the corporation effectively employs the ratification and validation procedures."); *cf.* Bigler & Zeberkiewicz, *supra* (concluding, "the Court of Chancery will now have jurisdiction as with all corporate acts, to use its equitable powers to validate or invalidate, as applicable, defective corporate acts and putative stock").

[103]   *See, e.g.*, DREXLER ET AL, *supra* note 102, § 17.02 at 17-21 ("Shares of stock issued without consideration are voidable at the option of the corporation.  The corporation . . . , therefore, may bring an action . . . to cancel invalidly issued stock.") (citing *Highlights for Children, Inc. v. Crown*, 227 A.2d 118 (Del. Ch. 1966)).

law fraud or a Section 225 action, if the stock had been voted.[104]  Accordingly, I hold that

Section 205 does not permit Plaintiffs to petition this Court to invalidate either the 2005

or 2009 Issuance.  Thus, because Plaintiffs' Section 205 claims only seek a declaration

that the 2005 and 2009 Issuances are invalid, they fail to state a claim as a matter of law

upon which relief can be granted, and I dismiss them on that basis.[105]

Several provisions in Section 205 support this conclusion.  For example, Section

205(d) identifies several factors that the Court of Chancery may take into account when

resolving matters pursuant to Subsections (a) and (b).[106]  The first two factors concern

whether the company believed the act was valid and treated it that way, the third concerns

whether validating the act would cause harm that the act itself originally would not have

---

[104]   *See, e.g.*, *Boris v. Schaheen*, 2013 WL 6331287 (Del. Ch. Dec. 2, 2013) (determining the validity of written consent relating to issuance of shares); *Keyser v. Curtis*, 2012 WL 3115453, at *3 (Del. Ch. July 31, 2012) (considering validity of stock issued by Company's sole director to himself); *Adlerstein v. Wertheimer*, 2002 WL 205684 (Del. Ch. Jan. 25, 2002) (Section 225 proceeding invalidating vote of preferred stock issued through trickery); *In re Bigmar, Inc. Section 225 Litig.*, 2002 WL 550469, at *1 (Del. Ch. Apr. 5, 2002) (resolving allegation that shares were invalid because issued at improperly convened board meeting).

[105]   Plaintiffs argue that Section 205(b)(10), which allows the Court to "[m]ake such other orders regarding such matters as it deems proper under the circumstances," also supports its interpretation that Section 205 allows the Court to invalidate stock under the statute.  8 *Del. C.* § 205(b)(10).  That interpretation, however, violates the *ejusdem generis* canon, which teaches that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Cirka v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 2004 WL 1813283, at *6 (Del. Ch. Aug. 6, 2004) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001)).  Accordingly, I reject it.

[106]   *See supra* text accompanying note 92.

caused, and the fourth concerns whether failing to validate the act would cause harm. These provisions contemplate a petitioner seeking to validate a defective corporate act because the company originally intended it to be valid, the company treated it as though it was valid, validating the act would not create additional harm that the company did not intend originally, or declining to validate the act would create or enable harm that the company never intended. Thus, Section 205 fundamentally concerns a company having taken an act with the intent and belief that it is valid and later petitioning the Court to correct a technical defect and thereby remedy incidental harm. I find Plaintiffs' interpretation of Section 205 as enabling a company to invalidate a prior act to be unreasonable and inconsistent with the statute's inherent presumption that the company intended the act and believed it to be valid at the time it was taken. I also disagree with Plaintiffs' contention that the General Assembly intended to grant the Court of Chancery jurisdiction to sanction such a renunciation of a prior corporate act.

### 2. Genelux cannot use Section 205 to grant itself standing under Section 225

To the extent Section 205 might be construed to permit a corporate plaintiff to petition this Court to invalidate a defective corporate act, I also question whether it was equitable here for Genelux to have pursued relief under both Sections 205 and 225 in the same action. Section 205 expressly grants a corporate plaintiff standing to seek relief under that statute.[107] It is not so clear, however, whether corporations have standing to

---

[107]    8 *Del. C.* § 205(a).

file a claim under Section 225(a) or (b).[108] Thus, it was at least arguably permissible, as a matter of law, for Genelux to assert a Section 205 claim and Simus to assert a Section 225 claim in the same action.[109] As this Court has noted, however, corporate acts are "twice-tested," once for statutory compliance and again in equity.[110] The Delaware Supreme Court echoed this principle in *Schnell v. Chris-Craft Industries, Inc.*, saying, "inequitable action does not become permissible simply because it is legally possible."[111]

Defendants argue that Genelux's recruitment of Simus to serve as Plaintiff in the Section 225 claim violates Sections 225(a) and (b).[112] Defendants also assert that this

---

[108] *See, e.g.*, WOLFE & PITTENGER, *supra* note 96, § 8.08[c] at 8-202 n.85 ("The issue whether the corporation itself has standing to initiate a Section 225 proceeding has yet to be resolved.") (citing *Insituform of N. Am. Inc. v. Chandler*, 534 A.2d 257, 270 n.1 (Del. Ch. 1987); and *Agranoff v. Miller*, 734 A.2d 1066 (Del. Ch. 1999)).

[109] Even though Genelux withdrew from the Section 225 claim, it continued pursuing its Section 205 claim and financing Simus's pursuit of both. Thus, I do not consider this issue entirely moot, as Genelux suggests, because it arguably did not eliminate any prejudice to Defendants by merely supervising the Section 225 claim rather than pursuing it directly as it has the Section 205 claim.

[110] *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 641 (Del. Ch. 2013); *see also* Adolf A. Berle, *Corporate Powers As Powers In Trust*, 44 HARV. L. REV. 1049, 1049 (1931) ("in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary").

[111] 285 A.2d 437, 439 (Del. 1971).

[112] Section 225 confers standing explicitly upon stockholders, directors and, in limited circumstances, officers—a list from which the corporation itself is "noticeably absent." WOLFE & PITTENGER, *supra* note 96 (citing *Insituform*, 534 A.2d at 270 n.1).

action is inequitable on the following additional grounds: (1) Simus's false verification and subsequent spoliation of evidence warrant dismissal of this case with prejudice; (2) Latham's representation of Genelux and Simus against Szalay constitutes a conflict of interest that is materially prejudicial to Szalay; and (3) Genelux's failure to satisfy its mandatory advancement obligation to Szalay was materially prejudicial to Szalay's ability to prepare adequately for trial. These arguments of Defendants may be colorable, but I do not consider it necessary to decide them in the circumstances of this case. As discussed in greater detail below, I dismiss the Section 205 claim and decide the Section 225 claim on the merits in Defendants' favor. Thus, I need not determine whether Genelux's allegedly inequitable conduct in these respects materially prejudiced Defendants or warrants dismissal. Similarly, in the related Advancement Action, I grant Szalay's motion for summary judgment that he is entitled to advancement as to this action under Sections 205 and 225. Hence, he is unlikely to suffer any prejudice in that regard in the future.

There is a good possibility, however, that Simus is a shill for Genelux, who the Company pushed forward to pursue the Section 225 claim on its behalf. Simus is an accomplished individual in his own right, and I understand from his testimony that he has invested a significant portion of his life as a Genelux stockholder and director, but it does not appear that Simus is paying for this litigation out of his own pocket. His Board seat is not subject to dispute. And, Plaintiffs admit that, although Simus does not have an engagement letter with any of the lawyers in this action, Genelux is paying all of the necessary legal fees and expenses. Furthermore, as discussed above, Simus filed

49

carelessly (or worse) a sworn verification stating that he read the Complaint, but later admitted that he had not read the whole thing and disclaimed knowledge of many of its core facts. Then, when Defendants sought production of his laptop computer to verify that he had, in fact, read it, he admitted to having disposed of the computer after this litigation began and after a litigation hold had been disseminated. Simus also admitted that Vandeman selected him to be the Plaintiff in the Section 225 action and at one point acknowledged that Genelux was driving this litigation. For all of these reasons, Simus's actions in this case are troubling, but they do not warrant, in my mind, further sanctions, let alone the draconian penalty of a dismissal.

In any event, the parties agree that the facts underlying both the Section 205 and 225 claims are the same. I also recognize that Section 205 is a new statute whose contours are not well understood and give deference to the fact that the record in this case is fairly robust and the parties already have incurred the time and expense of litigating it. Thus, I decline to dismiss either claim on the basis of Genelux's allegedly inequitable conduct.

### B. Legal Standard

Plaintiffs have the burden of proving each element, including damages, of each of their causes of action against each Defendant by a preponderance of the evidence.[113] Proof by a preponderance of the evidence means proof that something is more likely than

---

[113] *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at \*12 (Del. Ch. Oct. 14, 2015).

not.[114]  "By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose."[115]

## C.      Plaintiffs' § 205 Claim

I held above that Section 205 does not permit Plaintiffs to petition this Court to invalidate either the 2005 or 2009 Issuance.  Because Section 205 is a relatively new statute, I also dismiss Plaintiffs' Section 205 claim on two alternative grounds.  First, Plaintiffs failed to prove the 2005 Issuance was defective.  Second, because Plaintiffs did not raise their technical challenge to the 2009 Issuance under Section 205 until after trial, I deem that argument waived.  I discuss the 2009 Issuance here and the 2005 Issuance below in connection with Simus's Section 225 claim.

Plaintiffs argued for the first time in their post-trial opening brief that this Court should invalidate and declare defective the stock Szalay received in the 2009 Issuance on technical grounds.  In support, Plaintiffs argue that the 2009 Issuance is defective because the Company failed to satisfy the notice requirements prescribed in the Fourth Amended Certificate to comply with Section 228(e).  For the reasons that follow, I find this argument waived because Plaintiffs failed to provide timely notice of it.

Plaintiffs did not challenge the technical validity of the 2009 Issuance until their post-trial opening brief.[116]  There, Plaintiffs argued that the written consent that Thomas

---

[114]    *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[115]    *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015).

signed purporting to adopt the cancellation and reissuance of the Disputed Shares and the Fifth Amended Certificate was defective. Plaintiffs asserted, without citing or mentioning the Company's Fourth Amended Certificate, that the requirements of Section 228(e) were not satisfied because it was uncontroverted that "notice of the taking of the corporate action without a meeting by less than unanimous written consent [was not] given to" non-consenting stockholders. Thus, the argument concludes, the written consent adopting the Fifth Amended Certificate was invalid under Delaware law for failing to satisfy the notice requirements of Section 228(e).

Defendants responded in their answering brief that no such notice was required. Quoting Section 228(e), Defendants argued that, because the Company obtained the unanimous written consent of Thomas and Szalay, its only Series A Preferred stockholders, and no other stockholder vote was required, no additional notice was necessary. As Plaintiffs pointed out in their reply brief, however, Defendants were mistaken.[117] Section 4.6 of the Company's Fourth Amended Certificate mandated that:

---

[116] Pls.' Opening Br. 37.

[117] Defendants were mistaken, but perhaps not unreasonably so, as Latham appears to have made the same mistake in 2009 when Larson advised Genelux that, "[i]n order to increase the authorized shares of Series A from 3 to 4.5 million, Genelux needs the consent of a majority of the outstanding Series A." JX 61. I am unwilling, therefore, to allow Latham in its current role, which is adverse to Szalay, belatedly to inject into this case through an argument not fully revealed until Plaintiffs' post-trial reply brief and contradictory to the advice Latham gave to Genelux's previous Board a new challenge to the validity of the 2009 Issuance. My discomfort with this situation is heightened by the previously pending motion to disqualify Latham and RLF from representing Plaintiffs in this action.

52

> So long as any shares of the A-H Preferred Shares remain outstanding and unless otherwise required by law, the Corporation shall not, without the vote or written consent by the holders of at least 60% of the then outstanding shares of the A-H Preferred Stock, voting together as a separate class:
>
> . . . (b) increase the authorized number of shares of Preferred Stock or any series thereof . . . .[118]

As stated above, Section 228(e) requires that where an action is taken by written consent of the stockholders, "notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to" non-consenting stockholders.[119]

Plaintiffs waived this argument. It is settled Delaware law that a party waives an argument by not including it in its brief.[120] Although Plaintiffs did raise this argument for the first time in their post-trial opening brief, I conclude that Plaintiffs' failure to provide fair notice of this argument before trial caused Defendants sufficient prejudice to justify precluding Plaintiffs from pursuing the argument with regard to both Plaintiffs' Section 205 and 225 claims. Sections 205 and 225 are summary actions that Plaintiffs commenced and litigated on a somewhat expedited basis for nine months before raising their belated notice argument. Genelux possessed the documents underlying its argument

---

[118]    JX 37 § 4.6(b).

[119]    8 *Del. C.* § 228(e).

[120]    *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) (citing *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); and *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (party waived argument by not including it in its post-trial opening brief)), *aff'd*, 840 A.2d 641 (Del. 2003).

from the outset, but failed to mention the argument in their discovery responses, the pretrial order, or their pretrial briefs. Moreover, even though Plaintiffs introduced the argument in their post-trial opening brief, they did not articulate clearly the basis for that argument until their reply brief.

Finally, I consider it important that, had Plaintiffs put Defendants on notice of this argument in a timely manner, Defendants could have taken actions to meet it more effectively than they could post-trial. For example, Defendants might have used Plaintiffs' new argument to strengthen their motion to disqualify counsel. In addition, Defendants conceivably could have counter-petitioned this Court under Section 205 to validate the 2009 Issuance, which the parties admittedly considered technically valid and effective since its execution more than five years ago. Plaintiffs' delay made that impossible and thereby prejudiced Defendants and effectively limited this Court's inquiry to the Section 225 issues. Therefore, I conclude that Plaintiffs waived their challenge to the technical validity of the 2009 Issuance.[121] Because Plaintiffs' challenge to the validity of the 2005 Issuance is time-barred for the reasons discussed in Section II.D.1 *infra,* I dismiss Count I of Plaintiffs' Complaint in its entirety.

---

[121] Because Plaintiffs waived this argument, I do not reach Defendants' counterargument that Plaintiffs later provided the notice required by the Fourth Amended Certificate and Section 228(e) when the Company noticed the August 15, 2014 Annual Meeting.

## D.     Simus's § 225 Claim

Under the rubric of Section 225, Simus contends that Szalay did not have the right to vote 3 million Founders' Shares at the August 15, 2014 Annual Meeting, asserting instead that Szalay only had the right to vote 1.5 million Founders' Shares because the 2009 Issuance was invalid. Simus raises four challenges to the validity of the 2009 Issuance.[122]  First, Simus asserts that the 2009 Issuance was invalid because the 1.5 million shares of common stock that Szalay provided as consideration were themselves not valid. Second, he argues that the Wills Settlement extinguished any of Szalay's prior claims to the Disputed Shares. Third, Simus contends that the 2009 Issuance was not otherwise supported by valid consideration. Finally, he avers that Szalay accomplished the 2009 Issuance by fraud or misrepresentation.

### 1.     Simus failed to prove the 2005 Issuance was invalid

On or about December 11, 2005, Genelux issued to Szalay 1.5 million shares of common stock. Plaintiffs dispute the validity of this issuance on the grounds that there is no writing evidencing that the Board authorized it. Szalay conceded at argument that the issuance apparently is defective.[123]  Upon further examination, however, Board meeting

---

[122]     Simus also challenged the technical validity of the 2009 Issuance, but, as explained above, Plaintiffs waived that argument.

[123]     June 24 Arg. Tr. 58 ("We don't control the documents, but they say there isn't one. Apparently there isn't one in the corporate records. And, therefore, I couldn't possibly make any kind of argument to you that the common stock issued in 2005 was valid.").

minutes dated December 18, 2009 provide written evidence that the Board did authorize the 2005 Issuance both in 2005 and again in 2009.[124]

As discussed in greater detail above, the Board took steps in December 2009 to clarify its books and records in connection with the Abbott Deal. With the assistance of Latham, who is representing Plaintiffs in this action, the Board approved unanimously the adoption of the 2005 Stock Plan, which the Board adopted originally on January 10, 2005 and the stockholders approved on September 21, 2005. References to the 2005 Stock Plan appear elsewhere in the record. For example, in an amendment to a private placement memorandum dated February 7, 2005, Genelux disclosed, among other things, that the Board adopted the 2005 Stock Plan on January 10, 2005, and that the committee administering the plan could award common stock for consideration or no consideration to attract and retain employees, non-employee directors, and consultants.[125] In a private placement memorandum dated November 10, 2006, Genelux disclosed, among other things, that stockholders had approved the plan.[126] This private placement memorandum also reflects that Szalay had received restricted stock awards that, at that time, were valued at $15,000.[127] Furthermore, in a private placement memorandum dated May 15, 2008, Genelux disclosed "the financial terms of the current employment arrangements

---

[124]  JX 58.

[125]  JX 26 at 2.

[126]  JX 29 at 32.

[127]  *Id.*

56

between the Company and its officers and directors," which includes a table showing that Szalay had received 1.5 million shares of common stock in restricted stock awards as executive compensation.[128] The Company's stock transfer ledger confirms that the Company issued 1.5 million shares of common stock to Szalay on December 11, 2005,[129] and Szalay's corresponding stock certificate confirms the number and type of shares issued to him on that date.[130]

It is difficult to square these documents with Plaintiffs' argument that "[t]here are no documents showing, or even suggesting, that the board ever attempted to issue or otherwise authorize the issuance of 1.5 million shares of common stock to Dr. Szalay in December 2005."[131] As Plaintiffs pointed out, Szalay apparently has no recollection of whether the board authorized the issuance of common stock to him in 2005. Relying on *Grimes v. Alteon Inc.*, in which the Delaware Supreme Court stated that the DGCL "contemplate[s] board approval and a written instrument evidencing the relevant

---

[128]   JX 36 at 38. Szalay testified credibly that he "never paid a nickel" for the 1.5 million shares of common stock, Tr. 541, but I find that these documents prove Szalay received those shares as a form of executive compensation. Thus, I find unpersuasive Plaintiffs' assertion that the Company granted the shares for no consideration.

[129]   JX 100.

[130]   JX 101. Accordingly, I reject Plaintiffs' argument that these December 18, 2009 resolutions ratified a grant of options, not shares of common stock. Pls.' Opening Br. 27 n.4.

[131]   Pls.' Opening Br. 23 (citing Tr. 414 (Vandeman) (stating that the investigation revealed no evidence "whatsoever" of the board authorizing the issuance of 1.5 million shares of common stock in 2005)).

transactions affecting issuance of stock and the corporation's capital structure,"[132] Plaintiffs urge that, because Szalay's testimony is uncertain at best and, in any event, there exists no written instrument documenting board authorization of the issuance, this Court should find that the issuance of common stock in December 2005 was invalid.

I decline to do so for two reasons related to the December 18 Resolutions. First, the December 18, 2009 minutes state that the Board confirmed that the Board had authorized previously a written instrument governing the issuance of restricted stock awards and a committee to administer that plan and that the committee had issued 1.5 million shares of common stock to Szalay pursuant to the plan. Several documents in the record corroborate that such an authorization occurred. Far from there being "no written instrument documenting board authorization of the [2005] issuance," the record includes at least this written instrument, a Board resolution, documenting such authorization and references several others "suggesting" that the Board authorized that issuance in 2005, including documents that describe the very written instrument—*i.e.*, the 2005 Stock Plan—authorizing the 2005 Issuance. Because neither the 2005 Stock Plan itself nor minutes of the January 10, 2005 Board meeting are in the record, the evidence on this issue is not unequivocal. Based on my review of the record, however, I find that Simus failed to prove by a preponderance of the evidence that the Board never approved the 2005 Issuance and that no written instrument evidences that issuance.

---

[132]    804 A.2d 256, 266 (Del. 2002).

Second, to the extent that the December 18 Resolutions failed to ratify the 2005 Issuance, the related minutes prove unequivocally that both Genelux and Simus were on notice as of that date that Szalay might possess 1.5 million shares of common stock to which he was not entitled. Simus cannot disclaim such knowledge because the December 18 Resolutions state that he was on the committee that approved the grant of 1.5 million shares of common stock to Szalay on March 1, 2005.[133] Under Delaware law, a cause of action generally accrues at the moment of the alleged harmful act.[134] "Even though this is a court of equity, equity follows the law, and this court will apply statutes of limitations by analogy."[135] Whether a claim is styled as one for fraud or breach of fiduciary duty, among others, the applicable statute of limitations is three years.[136] Here, Plaintiffs challenge actions that occurred between five years and nine years before they filed their initial complaint, but they failed to plead facts that would support a reasonable inference that one of the tolling doctrines adopted by Delaware courts would apply here to excuse their delay,[137] much less particularized facts as required by Court of Chancery Rule 9(b)

---

[133]   JX 58 at 7.

[134]   *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 811-12 (Del. Ch. 2009).

[135]   *Id.* at 812; *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007).

[136]   *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *17 (Del. Ch. Oct. 31, 2013); 10 *Del. C.* § 8106(a).

[137]   *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *14 (Del. Ch. Dec. 23, 2008).

to support their reliance on fraudulent concealment.[138]  Defendants raised this pleading deficiency in a pretrial motion, but I declined to address it then based on the expedited nature of the proceedings at that stage and Plaintiffs' novel use of Section 205.  Having now heard and considered the evidence presented at trial, I find that Plaintiffs have failed to demonstrate fraudulent concealment or equitable tolling.[139]  Therefore, I conclude in the alternative that Plaintiffs' challenge to Szalay's ownership of the 1.5 million shares of common stock he received in 2005 is barred by laches.

**2.    The Wills Settlement did not extinguish Szalay's claim to the Disputed Shares**

Next, Simus argues that the Wills Settlement constitutes a release of any claim Szalay may have had to restore his Disputed Shares or, in the alternative, that Szalay never had a valid claim to the Disputed Shares in the first place.  Defendants protest that Plaintiffs failed to mention the Wills Settlement as a basis for invalidating the Disputed

---

[138]    *Boeing By Levit v. Shrontz*, 1992 WL 81228, at *3 (Del. Ch. Apr. 20, 1992) ("[A]llegations of fraudulent concealment necessary to toll the statute of limitations must be set forth with the particularity required by Chancery Court Rule 9(b).").

[139]    Plaintiffs attempted to argue, as early as their July 1, 2014 letter to stockholders, that "no one—not management or the Board—were permitted access to the corporate records by Szalay, so his story could not be confirmed."  JX 83 at 5.  But, Simus, himself a director and stockholder, testified that "there were documents available in the office" that were on the shelf and that he had looked at them.  Tr. 383 (Simus).  Furthermore, in 2009, Genelux retained Latham, which is more than qualified to have advised Plaintiffs about seeking documents under Section 220(d) or any other means available to the Board, if that were considered necessary or appropriate.

60

Shares in their interrogatory responses[140] and thereby ambushed Defendants at trial by pursuing the argument. Defendants argue that the tactic deprived them of an adequate opportunity to obtain on their own the actual complaint to which the Settlement Agreement relates and to prepare to cross-examine Plaintiffs' witnesses on this issue at trial. I consider it unnecessary to resolve the issue, however, because Defendants have the more persuasive argument on the merits.

Genelux asserted the claims in the California Complaint against the Wills. Series B Preferred stockholders (the "Series B Plaintiffs") also asserted claims against the Wills in another action in California. Genelux, Thomas, Szalay, and the Series B Plaintiffs (the "Genelux Parties") entered into the Wills Settlement with Will, his wife, and their trusts and trustees (the "Wills Parties") to settle claims raised in both actions (the "Disputed Claims").[141] The Disputed Claims included "all Claims and Obligations asserted or which may be asserted in the future . . . by: (a) Any of the Genelux Parties against any of the Will Parties; and (b) Any of the Will Parties against any of the Genelux Parties . . . ."[142] The Will and Genelux Parties also executed mutual releases intended to cover all possible claims. The Genelux Parties released "the Will Parties from any and all Claims against the Will Parties, or any of them, that the Genelux Parties, or any of them,

---

[140] JX 93.

[141] JX 18.

[142] *Id.* § 2.

ever had . . .,"[143] and the Will Parties released "the Genelux Parties from any and all Claims against the Genelux Parties, or any of them, that the Will Parties, or any of them, ever had . . . ."[144] Also as part of the settlement, the Wills transferred their Founders' Shares back to Genelux.[145]

The mutual releases, however, do not include claims by Szalay against Genelux and thus do not foreclose Szalay from seeking additional Founders' Shares from the Company. Besides, it was the Company that issued the shares in the first place, the Company that sued the Wills to remedy the Wills' wrongful acts, and the Company that finally issued the Founders' Shares to Szalay in 2009. For Plaintiffs to prevail on their argument that the Wills Settlement extinguished Szalay's claim to the Disputed Shares, Plaintiffs would have to prove that, by virtue of the Wills Settlement, Szalay released claims he had against the Company for Disputed Shares. The facts, however, are to the contrary: the Wills returned their Founders' Shares to the Company; the Company allowed the Wills to keep other payments they had received from the Company; the Wills and Genelux Parties executed broad mutual releases in each others' favor; and, most importantly, the Wills Agreement, by its terms, released only claims by the Genelux Parties against the Wills Parties and claims by the Wills Parties against the Genelux Parties. Although Szalay signed the Wills Settlement, Plaintiffs adduced no evidence that

---

[143]    *Id.* § 7(a).

[144]    *Id.* § 8(a).

[145]    *Id.* § 4.

he ever was adverse to the Company in connection with the Disputed Claims or released any claims that he had or might have had against the Company. Even Sundberg, who represented Genelux in connection with the Wills Settlement, testified (albeit equivocally) that the release would not preclude Szalay from seeking additional Founders' Shares from Genelux.[146]

Furthermore, Simus failed to carry his burden to prove that Szalay never had a valid claim to the Disputed Shares in the first place. As discussed above, even though the exact timing and details of the Founders' early discussions regarding Genelux's formation are unclear, the testimony of Thomas and Szalay regarding the Founders' agreements largely were consistent with each other, more credible than Will's, and supported, to a certain extent, by contemporaneous documentation. Hence, I find that the evidence shows that the Founders did reach some form of agreement in principle under which Szalay, Will, and Thomas would receive 3 million, 3 million, and 1.5 million Founders' Shares, respectively.

The parties dispute vigorously whether Will breached any agreement the Founders had reached by "fluffing off" 1.5 million Founders' Shares to his wife or whether Szalay had relinquished his claim to those shares by refusing to sign the credit agreement Will presented to him. To resolve these issues, the parties invite me to make determinations of

---

[146] Tr. 245-46 ("Q. So the fact that Dr. Szalay agreed to Exhibit 18 didn't legally foreclose him forever from seeking additional Series A stock. Would you agree with that? A. Not – I mean, again, the document speaks for itself, but that, as a stand-alone, was dealing with the Wills' stock. So, no, it would not have precluded them, possibly.").

witness credibility and findings of fact on an incomplete record in an effort to construe the terms of an oral agreement made twelve or thirteen years ago. I conclude, however, that to resolve the issues before me in this action under Section 225, I need not determine the precise terms of the Founders' oral agreement, or even if there definitively was an enforceable Founders' agreement. Rather, the question is whether Szalay had a colorable claim against Genelux to receive an additional 1.5 million shares of Series A Preferred stock under the alleged Founders' agreement and whether that claim survived as of the time of the 2009 Issuance. I answer both those questions in the affirmative.

Had Szalay pursued his claim against Genelux in a court of law, Szalay would have had the burden of proving the terms of an enforceable contract, a breach of that contract, and damages. That claim and its concomitant burden of proof, however, is precisely what Szalay offered and considered satisfied when Genelux issued him the Disputed Shares.[147] Thus, for Szalay's claim to the Disputed Shares to have been valid consideration for their issuance, his claim only needs to have been colorable.[148] Accordingly, I conclude that Plaintiffs' burden in this case is to prove by a preponderance of the evidence that Szalay's claim to the Disputed Shares was never even colorable. Plaintiffs failed to satisfy that burden. I therefore reject their argument that the Wills

---

[147] Although there is no explicit release in the record, I find the Board and stockholder resolutions reflect Szalay's acceptance of the exchange of Founders' Shares for common stock in satisfaction of his claim to the Disputed Shares.

[148] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 74 (AM. LAW INST. 1981) ("Forbearance to assert or the surrender of a claim or defense which proves to be invalid is not consideration unless . . . the forbearing or surrendering party believes that the claim or defense may be fairly determined to be valid.").

Settlement extinguished Szalay's claim to the Disputed Shares or, in the alternative, that Szalay never had a valid claim to the Disputed Shares in the first place.

### 3. The 2009 Issuance was supported by valid consideration

Simus argues that the 2009 Issuance is defective because it was not supported by valid consideration. I found above that Szalay provided the Company with two alternative forms of consideration in exchange for the Disputed Shares: the shares of common stock he received in the 2005 Issuance and the release, in effect, of his claim to additional Founders' Shares. First, the Company cancelled the 1.5 million shares of common stock that Szalay received in the 2005 Issuance in exchange for the Disputed Shares. Second, the Action by Written Consent indicates that the actions regarding the issuance as Series A Preferred Stock to Szalay was taken to correct a previous error.[149] This is the error regarding the Disputed Shares that Szalay had been complaining about for years. He agreed to the resolution of that issue reflected in the 2009 Issuance. Thus, even if the 2005 Issuance was ineffective, Szalay's claim against the Company for additional Founders' Shares effectively would have been satisfied or released as consideration for the 2009 Issuance of the Disputed Shares. Accordingly, I reject Simus's argument that the 2009 Issuance is invalid because of a lack of consideration.

### 4. Plaintiffs failed to prove Szalay accomplished the 2009 Issuance by fraud

Finally, Plaintiffs argue that, because Thomas's decision to sign the written consent authorizing the 2009 Issuance was based on Szalay's deceit and

---

[149] JX 62.

65

misrepresentation, this Court should find that Szalay never validly held the Disputed Shares and thus did not have the right to vote them in the August 15, 2014 Annual Meeting. In response, Defendants argue that the only ambiguity in the record was created by the testimony of Plaintiffs' witnesses and that none of the demands and false claims they allege Szalay made are supported by the weight of the evidence.

According to Plaintiffs, Szalay accomplished the 2009 Issuance through a fraudulent scheme by creating a cloud of misinformation regarding Abbott's purported insistence on the conversion of 1.5 million of Szalay's shares of common stock into 1.5 million Founders' Shares. There is no dispute that such a conversion required Thomas's consent, but Thomas recently had voted against Szalay's "correction and reissuance scheme." The Company claims that Szalay falsely informed Thomas and the Board that the Abbott Deal was contingent upon the correction of his Preferred Stock holdings and it was Szalay's false representation that resulted in his securing Thomas's written consent and the Board vote at the December 2009 Board meeting. But, Zindrick testified that Szalay told him that Szalay would block the Abbott Deal if his Founders' Shares were not "corrected,"[150] so Zindrick stepped in to broker a resolution with Thomas. That testimony provides no support for Plaintiffs' position. Thomas also testified, however, that Szalay told him that Abbott would not commit to financing Genelux unless Thomas

---

[150]  Tr. 264. Zindrick further testified that Szalay approached him directly to put pressure on Thomas to change his vote. *Id.*

signed off on issuing Szalay's Founders' Shares.[151]  Szalay allegedly communicated a similar message to Simus.[152]

Plaintiffs allege that Szalay conveyed these conflicting messages intentionally because Zindrick, as the lead negotiator for the Abbott Deal, would have known Abbott was not conditioning the deal on Szalay getting his Founders' Shares, but Thomas and Simus were not close enough to the negotiations to know Szalay was lying.[153]  I reject this argument for two reasons.  First, I find that Thomas was a self-interested witness, committed to maintaining his veto power as a Series A Preferred stockholder, notwithstanding the fact that it was inconsistent with the alleged Founders' agreement. And second, because Simus is not a reliable witness.  Simus admitted being less than candid both when he signed the false verification and when he swore in an affidavit that he had disposed of his laptop computer prior to Christmas 2014[154] when, in fact, he had

---

[151]  Tr. 141

[152]  Tr. 316-17 (Simus).  Simus also testified that after Szalay approached him directly, Simus contacted Thomas about changing his vote.  Tr. 316-18.

[153]  Tr. 141-42 (Thomas).

[154]  JX 109 (Aff. of Ron Simus ¶ 3 (Mar. 31, 2015)).

traded it in at a pawn shop.[155] In addition, Plaintiffs themselves have asserted to the Court that Simus has memory problems and that his memory is unreliable.[156]

Defendants argue, however, that there is nothing reflected in the minutes of the December 18, 2009 Board meeting regarding Szalay's alleged misrepresentation[157] and that Plaintiffs cannot point to a single document reflecting this misrepresentation.[158] In fact, Zindrick and Larson were present at the meeting and, as the primary negotiators with Abbott, were fully capable of correcting any supposed misrepresentations by Szalay regarding Abbott's negotiating position. Furthermore, Zindrick himself recorded the meeting minutes and confirmed their accuracy at trial.[159] Finally, Plaintiffs could have put on affirmative evidence regarding Abbott's supposed position by calling Tyree, Abbott's lead negotiator in 2009 and Genelux's current Chairman, as a witness, but they did not do so.

---

[155] Tr. 366-68 (colloquy between Simus and the Court in which Simus explains that he took his old laptop computer to a pawn shop in December 2014 and later returned to acquire a secondhand laptop computer in February 2015).

[156] Tr. 324 (Simus); Pls.' Opening Br. 48 n.16 ("Any discrepancy between Plaintiffs' opposition to the motion to compel and Dr. Simus's subsequent affidavit exists because Dr. Simus's recollection of the events is not entirely clear." (citing Tr. 324-25 (Simus))).

[157] JX 58.

[158] Tr. 194-95 (Thomas unable to reference any documents); Tr. 301-02 (Zindrick unable to reference any documents).

[159] Tr. 286.

Defendants also emphasize the lack of documentary evidence in the record supporting Plaintiffs' position. I agree that the documentary evidence is informative. By October 19, 2009, Larson had recognized during capitalization diligence that the Company's earlier efforts to authorize the Fifth Amended Certificate were ineffective.[160] On November 9, 2009, Abbott's senior counsel, Dina Shniderman, told Larson she thought the Series I Preferred stock was authorized and created per the unfiled Fifth Amended Certificate and she asked whether it had been approved and filed yet.[161] Shniderman and Larson continued discussing the Fifth Amended Certificate and looped in Zindrick on November 24, 2009.[162] A few weeks later, Zindrick emailed Szalay that he had learned recently that the Fifth Amended Certificate had not been filed, Latham might have issues doing so, and Zindrick "had a concern about the timing/conditions of being able to authorize shares and for them to book payment."[163] Nonetheless, Zindrick expressed confidence that Abbott would accept shares whenever Latham felt the authorizing documents were suitable for filing and had been filed.[164]

In another email to Szalay on December 15, 2009, three days before the December 18 meeting, Zindrick stated:

---

[160]   JX 50.

[161]   JX 51.

[162]   *Id.*

[163]   JX 53.

[164]   *Id.*

Cheston [Larson] proposed to Abbott the idea of filing the approved [Fifth] Certificate of Incorporation to enable issuance of authorized shares and closing of the deal this year. Abbott requires certain conversion/liquidation rights be set prior to issuance of the stock and insists that the new, revised Certificate of Incorporation be approved and filed prior to closing. If we are unable to move them, realistically, Genelux will need to put the certificate to a separate vote prior to the shareholders meeting and will not close this deal until early 2010.[165]

Then, on December 17, Zindrick asked Larson whether he could confirm the Board's previous vote on the Founders' Shares, which Szalay thought was earlier in the year.[166] Larson replied that Latham had not found approval of the Szalay transfer of Founders' Shares for shares of common stock, but would include it in the resolutions being prepared.[167] At the Board meeting on December 18, Thomas voted against a resolution authorizing the exchange of Szalay's shares of common stock for the Disputed Shares.[168]

On December 20, 2009, Larson recommended to Zindrick that "[e]ither Dr. Szalay can convince Thomas to approve, or we should drop the authorized Series A to 3 million [in the Fifth Amended Certificate]."[169] Defendants note that, after Latham's mistake was made known, Simus and Zindrick approached Thomas individually about changing his

---

[165]    JX 55.

[166]    JX 56.

[167]    *Id.*

[168]    JX 58 at 6.

[169]    JX 61.

70

vote as a Preferred stockholder.[170] Defendants also point to Szalay's testimony denying that he ever told anybody that he would hold up the Abbott Deal or that Abbott would not commit to financing unless his Founders' Shares situation was corrected.[171]

Based on the conflicting testimony and limited documentary record on this issue, I must consider issues of credibility. I begin by noting that none of the witnesses are disinterested third parties. Each of Simus, Thomas, and Zindrick either was involved in the secret plot to remove Szalay from the Board that led to this action to invalidate Szalay's Disputed Shares or the 2009 Issuance of the Disputed Shares that purported to dilute Thomas's percentage of Founders' Shares. Szalay's self-interest is equally plain. With the exception of Simus, the relevant witnesses were generally competent and credible. I did not find credible, however, Simus's testimony that Szalay told Simus that Abbott, not Szalay, was insisting on the conversion of Szalay's Founders' Shares; therefore, I disregard that testimony.

Having considered the parties' conflicting narratives and the evidence of record, I find the relevant facts to be as follows. Genelux worked with Latham earlier in 2009 to adopt the Fifth Amended Certificate and authorize an increase of the Founders' Shares to 4.5 million to satisfy Szalay's outstanding claim. Thomas voted against this authorization, but Murphy mistakenly recorded that the measure had passed. Latham continued representing Genelux on the Abbott Deal through the year and conducted

---

[170]    Tr. 290-91 (Zindrick); Tr. 321-23 (Simus).

[171]    Tr. 510-11.

71

capitalization diligence, which resulted in Latham drafting the resolutions discussed at the December 18, 2009 Board meeting. Thomas, the dean of a business school and long-time investor, acknowledged under oath that Abbott's interest in clearing up any uncertainty in Genelux's capitalization table was not unusual.[172] Other documents in the record suggest that Abbott was, in fact, interested in exactly that, although nothing indicates one way or the other whether Abbott cared about Szalay's claim to the Disputed Shares beyond having Genelux resolve any such disputes promptly. I also consider it more likely than not, and understandable, that Szalay did try to leverage the opportunity for a substantial investment from Abbott to achieve resolution of his longstanding claim to the Founders' Shares to which he always believed himself entitled.

In summary, I do not find the conduct of the relevant parties in attempting to close the Abbott Deal, and least of all Thomas or Szalay, the two remaining founders of the Company, to be problematic. Instead, I find that, at worst, the parties misunderstood or miscommunicated the necessary steps for successfully closing Genelux's single largest investment to that date. For example, Latham had an interest in following through on its earlier attempt to adopt the Fifth Amended Certificate, Szalay could have miscommunicated Abbott's interest in cleaning up Genelux's capitalization table as being

---

[172]   Tr. 188-89 ("Q. Would you find it unusual if the company making an investment wanted to make sure that the capitalization table in the company they were investing in had no issues associated with it and, in fact, was correct? . . . A. I wouldn't find it unusual.").

an interest in satisfying his claim to the Disputed Shares, and Thomas likely felt pressure from all sides to make sure the deal closed regardless of who said what.

For all of these reasons, I find that the evidence does not support Plaintiffs' claim that Szalay accomplished the 2009 Issuance by fraud, deceit, misrepresentation, or otherwise. Accordingly, I conclude that, as of August 15, 2014, Szalay did have the right to vote all 3 million Founders' Shares that he purported to own. I further find that Szalay voted properly all of those shares in favor of Roeder and Georgiou. Because a majority of the Founders' Shares voting as a separate class were cast in favor of electing Roeder and Georgiou, I conclude that those two Defendants have the right to occupy the Board seats in dispute in this action under Section 225.

Finally, although I have reached my conclusion on this issue based on Plaintiffs' failure to carry their burden of proof, that conclusion is strengthened by the fact that, even if Plaintiffs had satisfied their burden here, Plaintiffs' argument that the Founders' Shares Szalay received in the 2009 Issuance are invalid is time-barred. Under Delaware law, if a fiduciary breaches his or her disclosure obligations in connection with soliciting stockholders' votes or consents, and the Court finds that such breaches "inequitably tainted the election process," that could be grounds for setting aside otherwise valid votes or consents.[173] Assuming Plaintiffs pled the elements necessary for a fiduciary duty of disclosure challenge, however, my role in such an inquiry under Section 225 would be limited to ensuring the fairness of the consent solicitation in the sense that there was no

---

[173] *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 72 (Del. Ch. 2008).

73

breach of fiduciary duty, breach of contract, fraud, or other wrongdoing.[174]  And, as discussed above in connection with Plaintiffs' challenge to the 2005 Issuance, that kind of cause of action accrues at the moment of the alleged harmful act and is subject to a three-year statute of limitations in Delaware.[175]  Again, Plaintiffs' Complaint challenges acts that occurred nearly five years ago in 2009, but they failed to prove facts allowing for even a reasonable inference that the analogous statute of limitations should be tolled or laches should not apply due to fraudulent concealment.  Therefore, as with Plaintiffs' challenge to Szalay's ownership of the common stock he received in the 2005 Issuance, I conclude in the alternative that Plaintiffs' challenge to Szalay's ownership of the Founders' Shares he received in the 2009 Issuance is time-barred.

### E.  Defendants' Claims for Sanctions

Defendants argue that I should sanction Plaintiffs based on Simus's false verification and failure to preserve evidence, the conflicts of interest faced by Plaintiffs' counsel, the introduction of evidence contradicted by prior judicial admissions, and the filing of pleadings that contradict witness testimony and documents.  I have reviewed all of these arguments.  I previously ordered sanctions for Plaintiffs' actions regarding the false verification and failure to preserve evidence and decline to impose additional sanctions for those actions here.  I also denied Defendants' motion to disqualify Latham

---

[174]  *Id.*; *see also Kerbawy v. McDonnell*, 2015 WL 4929198, at \*23 (Del. Ch. Aug. 18, 2015).

[175]  *See supra* notes 134-139 and accompanying text.

and RLF based on alleged conflicts. As discussed above, I took judicial notice of what Defendants argue is a "prior judicial admission" without adopting it as a conclusive judicial admission or granting it the effect of judicial estoppel. That is, I relied on the fact that the statements were made by Genelux in papers filed in court and consider that relevant evidence of what Genelux and its Board knew and the positions they took in or around 2003. But, the evidence does not indicate that any court made a decision in reliance on those statements. Therefore, I have not admitted them for the truth of the matter asserted. I also considered Defendants' allegations that Plaintiffs' pleadings contradicted their witnesses' testimony and documents they placed in evidence.

On the whole, however, I conclude that Plaintiffs' conduct does not rise to the level of egregiousness necessary to grant Defendants' request for sanctions, especially in light of the fact that Defendants have prevailed on the merits of this action and, in my view, were not materially prejudiced by the actions they challenge. As a result, I deny Defendants' request for an award of attorneys' fees or the imposition of additional sanctions.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' request for relief pursuant to 8 *Del. C.* § 205 (Count I) and 8 *Del. C.* § 225 (Count II) are denied and those counts will be dismissed. Szalay is entitled to a declaratory judgment that he was entitled to vote 3 million Founders' Shares at the August 15, 2014 Annual Meeting, which shares constituted a majority of outstanding shares voted in favor of electing Roeder and Georgiou. Accordingly, Roeder and Georgiou are entitled to a declaratory judgment that they are

75

both validly elected directors of Genelux effective August 15, 2014.  In all other respects, the requests for relief of both Plaintiffs and Defendants are denied.

An implementing order accompanies this Opinion.